## 44709. In re BABY GIRL EASON.
(358 SE2d 459)

GREGORY, Justice.

David R. Scharlach filed a petition for legitimation of his biological child in Cobb Superior Court on December 30, 1986. The petition was answered and objected to by Nola Dekota Eason, the child's mother, and by Christian Homes for Children, Inc., a child placement agency with which the mother placed the child for adoption. A married couple who sought to adopt the child were allowed to intervene. They were identified as Jane and John Doe to conceal their true identities. Rex R. Ruff was appointed guardian ad litem for the child. The trial court entered an order providing the scope of its inquiry would not be limited to the parental fitness of Scharlach but would look to the best interests of the child including a comparison of prospects for the child's well being if reared by the biological father as opposed to being reared by the adopting parents. The order also allowed the adopting parents to proceed as Jane and John Doe. This interlocutory appeal was taken by the biological father.

Two issues are presented. First, we must decide if an unwed biological father under the circumstances has a federal constitutional right to legitimate his child unless he is unfit to have custody of the child. Second is the issue whether the adopting parents may proceed as Jane and John Doe without revealing their true identities.

Certain facts appear to be undisputed from the record as it exists at this stage of the litigation. Scharlach met Eason in Atlanta in late 1985. They began to date and to have sexual intercourse. The child in question was conceived as a result of their relationship. She was born on October 19, 1986. When it was learned that Eason was pregnant, she and Scharlach discussed what was to be done. During these discussions the possibilities of adoption and abortion arose. Some weeks before the birth of the child Scharlach moved to California on account of his employment. There was no further communication between the two. Eason decided to place the child for adoption and accordingly, on October 22, 1986, signed a form surrendering custody of the child to Christian Homes for Children, Inc. for purposes of adoption and relinquishing all parental control. A petition for adoption of the child was filed by Jane and John Doe. Under the requirements of OCGA § 19-8-7 (a) notice was given to Scharlach prompting his petition for legitimation pursuant to OCGA § 19-8-7 (c).

Other important facts are in dispute. Scharlach maintains that he told Eason from the outset that he wanted custody rather than an adoption. She says he expressed such sentiments from time to time but on occasion, including their last parting, acquiesced in the plan for adoption. She even testified that he once proposed a sale of the child for $10,000, but he contends he merely sought to test her sincer-

ity. He maintains he offered financial support but her testimony is he never provided any such support and she knew he was unable to afford financial support. She says he left for California leaving her no forwarding address nor telephone number. He says she well knew how to reach him through his friends. There is also considerable conflict between the two regarding a brief period during the pregnancy when she lived with him. He contends he offered to help support her in this way. She contends he merely offered a shared expense arrangement. The record contains much evidence of the backgrounds and current circumstances of both Eason and Scharlach which need not be set forth in this opinion.

1. There are competing interests of overwhelming value at stake in the outcome of this case. A biological father may have ties to the child which demand careful analysis in giving them legal effect. The adopting parents who have developed strong emotional connections through their custody of the child, beginning very soon after birth, have interests they likely value beyond measure. The child's future well-being is at risk. The adoption agency and the courts need guidance which will allow them to adequately deal with the interests involved. Our duty is to look to the federal constitutional challenge before us and allocate rights required to be recognized, in particular as those rights have been illuminated by four recent opinions of the United States Supreme Court: *Stanley v. Illinois*, 405 U. S. 645 (92 SC 1208, 31 LE2d 551) (1972); *Quilloin v. Walcott*, 434 U. S. 246 (98 SC 549, 54 LE2d 511) (1978); *Caban v. Mohammed*, 441 U. S. 380 (99 SC 1760, 60 LE2d 297) (1979); and *Lehr v. Robertson*, 463 U. S. 248 (103 SC 2985, 177 LE2d 614) (1983).

While the possible circumstances of relationships between unwed fathers and their children are of great variety, certain general classifications have evolved from the four opinions cited. See Elizabeth Buchanan's article, "The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson," 45 Ohio St. L.J. 313 (1984). Unwed fathers who either have custody or have previously had custody so as to develop emotional ties with their children constitute one category. Such a case was *Stanley*, supra. Stanley was not married to the mother of his children but lived intermittently with her for 18 years and clearly had taken on parental duties and formed emotional bonds with the children. The mother died. Under Illinois law the children were declared wards of the state and separated from the father without a hearing. But Illinois law provided that mothers and married fathers could not be separated from their children without a hearing and proof of their unfitness to have custody. In effect there existed a presumption of the unfitness of all unwed fathers. The Court held that due process of law under the Fourteenth Amendment entitled Stanley to a hearing on his fitness as a parent and that to afford other

parents such a hearing but to deny him was a denial of equal protection guaranteed by the Fourteenth Amendment. Clearly, then, a biological unwed father who has custody and performs the role and duties of a parent has a recognized constitutional right to custody of his children. The constitutional interests of such a father are equal to any other custodial parent. In *Caban*, supra, the unwed father lived with the mother several years during which two children were born. He supported them and otherwise acted as a parent toward them. The couple separated. The mother married another man, who eventually sought to adopt the children. Under New York law a mother was entitled to a veto power over the adoption of her child unless she had either abandoned the child or had been adjudicated incompetent to care for the child. But the New York law only afforded an unwed biological father the right to prevent the adoption by showing it not to be in the best interests of the child. Writing for the majority, Justice Powell found a violation of equal protection. Caban had formed a substantial relationship with his children even though a separation had occurred later.

The second category of unwed fathers are those who have never had custody of their children. In *Quilloin*, supra, the child was eleven years old and had spent his life in the custody and control of his mother. She married, and the stepfather sought to adopt the child. The biological father objected. The courts here in Georgia, without finding Quilloin unfit as a parent, approved the adoption using the best interests of the child as the standard. The U. S. Supreme Court in a majority opinion written by Justice Marshall held that substantive rights under the Due Process Clause were not violated by application of the best interests of the child standard under the circumstances of the case. Furthermore, the court found no denial of equal protection due to the veto power over adoptions afforded to a fit married father who is separated or divorced from the mother. But, *Quilloin* does not hold that an unwed father who never had custody has no constitutional rights in his child. The court pointed out Quilloin was not a father who "at any time had, or sought, actual or legal custody of his child." *Quilloin*, supra at p. 255. Further, the adoption would have the effect of recognizing a family already in actual existence.

From the above it is apparent that there exists a continuum of unwed father-child relationships with assigned degrees of protection afforded rights to custody. At the highest level are those relationships which have been fully developed through present or past custody. Such unwed fathers must be treated equally with other parents when

their child is to be adopted. There is also a right[1] to custody in such an unwed father who has not been shown unfit, at least this is true if other parents must be shown unfit before loss of custody. There are certainly relationships between unwed fathers and children which, while short of full custody, nonetheless establish substantial bonds. Such fathers may generally visit their children and furnish some support and otherwise maintain contact with them. See Buchanan, supra at page 338. Then there are other unwed fathers who have developed no relationship with their children. Their only connection is biological. That was the circumstance in *Lehr*, supra. Lehr had lived with the mother before the child's birth but not after. He never offered to marry the mother nor did he support the child. When the child was over two years old the stepfather who had since married the mother sought to adopt. Lehr received no notice of the adoption since he fell into none of the categories of unwed fathers entitled to notice under the New York statute. One such category was unwed fathers who signed a registry giving notice of their interest. Justice Stevens' opinion for the majority holds that the statute violated neither due process nor equal protection. At the heart of the analysis are the following observations:

"The difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban*, and the potential relationship involved in *Quilloin* and this case, is both clear and significant. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com(ing) forward to participate in the rearing of his child,' *Caban*, 441 U. S., at 392, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he 'act(s) as a father toward his children.' Id., at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. '(T)he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot(ing) a way of life" through the instruction of children . . . as

---

[1] We are mindful of differing views as to whether a substantive due process right exists to afford a veto power or fitness test. But Georgia affords unwed mothers these rights (OCGA § 19-8-3) and due to the interplay between due process and equal protection outlined herein we need not decide the issue because that interplay affords constitutional protection for this father in light of the Georgia law protecting unwed mothers. Cases discussing the substantive due process issue are: *In re Baby Girl M.*, 37 Cal.3d 65, 688 P2d 918, 207 Cal. R. 309 (1984); *In the Matter of Karen A.B.*, 513 A2d 770 (1986); *In re Adoption of Mullenix*, 359 S2d 65 (Fla. App. 1978); *Adoption of Baby Doe*, 492 S2d 508 (La. App. 3rd Cir. 1986); *Durr v. Blue*, 454 S2d 315 (La. App. 3rd Cir. 1984); *In re Riggs*, 612 SW2d 461 (Tenn. App. 1980); *In the Interest of Unnamed Baby McLean*, 697 SW2d 479 (Tex. App. 2nd Dist., 1985).

well as from the fact of blood relationship.' [Cits.]" *Lehr v. Robertson*, 463 U. S. at 261.

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." Id. at 262.

We conclude from the four opinions above and the most helpful analysis of them in Elizabeth Buchanan's article, supra, that unwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected. This opportunity interest begins at conception and endures probably throughout the minority of the child. But it is not indestructible. It may be lost. It was lost by Lehr when he failed to develop a relationship with his child or even sign the registry giving notice of his claim or interest. It was diminished for Quilloin by his failure to develop a substantial relationship with the child for over eleven years. It is, then, an interest which can be abandoned by the unwed father if not timely pursued. On the other hand it is an interest which an unwed father has a right to pursue through his commitment to becoming a father in a true relational sense as well as in a biological sense. Absent abandonment of his interest, a state may not deny a biological father a reasonable opportunity to establish a relationship with his child.

But our case goes beyond any of the factual circumstances of the four United States Supreme Court cases discussed. We have before us an unwed father, an infant some nine months old, adopting parents who have been in custody of the child virtually all its short life, and a mother who has surrendered her rights in the child in favor of the adoption. Scharlach has had no custody but he possesses an opportunity interest because he is the biological father. Assuming, without deciding, he has not abandoned his opportunity interest, what substantive standard is he entitled to have his rights evaluated by, a fitness test as he asserts, or a best interests of the child test, as the appellees assert?

There are circumstances in which the best interests of the child standard is adequate. For instance, where there is a divorce each party has equal rights and a fitness test cannot be used. Thus, a best interests test is sufficient. On the other hand a fit biological father who pursues his interest in order to obtain full custody of his child must be allowed to prevail over strangers to the child who seek to adopt. He is in pursuit of a recognized interest which, if obtained, places him in circumstances of a custodial unwed father. A different

situation is found in a stepfather adoption. A best interests standard is sufficient to place custody in the mother when challenged by an unwed father. Thus an unwed father who faces a mother who has custody and a stepfather who seeks to adopt will never have an opportunity to place himself in the category of a custodial father. A best interests test is adequate. Our case at hand presents yet another circumstance. Those who were strangers are no longer strangers. The adopting parents have developed a relationship to the child and are presumably providing the care and maintenance parents should provide children. That circumstance might permit a best interests test to be used under other facts. But the relationship here between adopting parents and child did not take place in the absence of state participation. The adoption laws were being pursued through the courts and this accounts for the placement of the child with the adopting parents. The unwed father has a constitutionally protected interest which cannot be denied him through state action. Only the state can alter its action to prevent the development of a parent-child relationship with adopting parents until the unwed father's rights are resolved. Thus we conclude if Scharlach has not abandoned his opportunity interest, the standard which must be used to determine his right to legitimate the child is his fitness as a parent to have custody of the child. If he is fit he must prevail.

However, evidence is in sharp conflict as to whether Scharlach has abandoned his opportunity interest through his conduct with regard to Eason and the child and otherwise. On remand the trial court must first determine this issue. If it is determined that the opportunity interest has been abandoned Scharlach's rights may be terminated. Compare OCGA § 19-8-6 (a). If it is determined that the opportunity interest has not been abandoned then the court must determine whether Scharlach is a fit person for custody. If he is fit, legitimation should be granted. If not, it should be denied.

In summary we hold that unwed fathers[2] possess an opportunity interest protected by due process of law. If timely and diligently pursued, and not abandoned, this opportunity interest will lead an unwed father in Scharlach's circumstances to enjoy the benefits of custody and entitle him to equal treatment under law accorded other parents. Thus we hold because Georgia law affords an unwed mother a fitness test or veto power under the circumstances it must also afford Scharlach a fitness test or veto power, *provided he has not abandoned his opportunity interest.*

2. Appellant contends the trial court's order which allows the

---

[2] We do not mean to imply that certain unwed fathers such as rapists or those who contribute semen for artificial conception under modern medical techniques are included within this group. Such cases are beyond the scope of this opinion.

adopting parents to proceed as Jane and John Doe, to keep their true identity secret, was error because he is entitled to know who they are and confront them directly in order to address the best interests of the child issue. But we have determined appellant is entitled to a fitness test unless he has abandoned his opportunity interest. If found fit he will gain custody. Otherwise, he will not participate in a determination of the best interests in the child and will have no need to know the identity of the adopting parents.

*Remanded with instructions to proceed consistent herewith. All the Justices concur.*

DECIDED JULY 23, 1987.

Adoption; legitimation. Cobb Superior Court. Before Judge Kreeger.

*Russell & Herrera, D. Lynn Russell, Ann J. Herrera,* for appellant.

*Hurt, Richardson, Garner, Todd & Cadenhead, A. Paul Cadenhead, E. Clayton Scofield III, Rex R. Ruff, Edward W. Klein III,* for appellee.

*Bauer, Deich & Raines, Henry R. Bauer, Jr., Jeanne Jones, William L. Jones, Robert P. Walter, Katherine D. Arrington,* amici curiae.