## A99A2271. LaBREC v. DAVIS.
(534 SE2d 84)

SMITH, Judge.

We granted Kevin LaBrec's application for discretionary appeal to consider an order granting the petition of Jonathan Davis to legitimate the minor child, Denver, whom LaBrec had been raising since birth as his own son. Notwithstanding the existence of an order that had legitimated Denver as LaBrec's child, the trial court granted Davis's petition. Because we find that the trial court misapplied controlling authority, apparently failed to consider the legal effect of a prior order legitimating the child as LaBrec's son, and also failed to consider the best interest of the child, we vacate the judgment and remand for further findings consistent with this opinion.

The underlying litigation arose after Davis, Denver J. LaBrec's apparent biological father, filed suit against LaBrec, the only father Denver had ever known.[1] The competing paternity claims to Denver, a minor child, evolved into a difficult and contentious court battle.

The evidence shows that LaBrec and Elizabeth Wolff "had been in an intimate relationship for approximately six years prior to the child's birth," a relationship that ended shortly after Denver was born. This child, raised as Denver J. LaBrec, was born May 17, 1995. LaBrec claims, and Davis does not dispute, that LaBrec was present at Denver's birth and that LaBrec's name appears on the birth certificate as Denver's father. See Court of Appeals Rule 27 (b) (1) (failure to controvert an appellant's statement of facts constitutes consent to statement).

Denver's mother, Wolff, has a history of mental instability. Some time subsequent to giving birth, Wolff experienced serious psychological problems. After Wolff attempted suicide in July 1996 while visiting relatives in Missouri, LaBrec returned with Denver to Georgia. LaBrec sought and obtained a court order legitimating Denver as his son and that order was entered on July 15, 1996. In support of LaBrec's petition to legitimate, Wolff testified by affidavit, acknowledging LaBrec as the natural and biological father of Denver. In August 1996, LaBrec commenced a court action to obtain sole legal and physical custody of Denver. In response to LaBrec's effort to

---

[1] The child's court-appointed guardian ad litem stated in court on March 24, 1999, that Davis had never met the child, who by then was nearly four years old.

obtain custody, Wolff for the first time asserted that LaBrec was not Denver's father. Nevertheless, Wolff and LaBrec entered a consent agreement, and on February 4, 1997, the trial court awarded sole permanent legal and physical custody of Denver to LaBrec.

On August 7, 1997, Davis served LaBrec with a complaint in which Davis sought to establish paternity, to legitimate the child, and to gain custody of Denver. Davis, the probable biological father of the minor child according to DNA test results, admitted that he had engaged in unprotected sexual relations with Wolff about nine months before the child's birth. Davis claimed that he did not discover that he was Denver's father until December 5, 1996, when the child was already over a year and a half old.[2]

Based on an assertion of his delayed discovery of the existence of the minor child and a claim to be a "loving, fit, and proper person to have custody," Davis sought to have set aside both prior court orders, the order finding Denver LaBrec to be the legitimate child of LaBrec and the other order awarding permanent custody of the child to LaBrec. Davis also sought a new order legitimating the child as his son, awarding custody of the child to him, and changing the child's surname from LaBrec to Davis. Because Davis had to fulfill an enlistment obligation in the Air Force, he suggested that until he returned stateside his mother, Susan Green, would be fit to raise Denver along with her own "three minor children in White Water, Missouri, a small farming community."[3]

Meanwhile, Davis's lawsuit proceeded through the legal system. At the March 1999 hearing on Davis's petition, counsel conceded that Davis would continue to have a military obligation to the Air Force until 2004.[4] His counsel admitted to the court, however, that Davis was no longer stationed in Guam but was in Missouri at the time of the hearing. Davis's counsel argued that since Davis had not abandoned his opportunity interest in fathering Denver and was "fit" to be a parent, Davis had a constitutional right to legitimate his child under the holding of *In re Baby Girl Eason*, 257 Ga. 292, 297 (358 SE2d 459) (1987).

The court-appointed guardian ad litem addressed the court and pointed out that the two people who Davis suggested would care for

---

[2] Blood tests established the likelihood of the paternity of Davis to a probability of 99.12 percent.

[3] About three weeks after Wolff purportedly told Davis that he was Denver's biological father, Davis commenced his enlistment in the United States Air Force and was eventually stationed in Guam.

[4] In an affidavit designed to support Davis's efforts to legitimate and obtain custody of Denver, Wolff testified, "I believe that Susan Green, mother of Jonathan R. Davis, is a fit and proper person to serve as guardian of my son during his father's service in the United States Air Force, and that it would be in the best interests of my son to reside with her."

Denver, Davis's mother, Green, and Davis, "have never met this child." During the hearing, the trial judge noted that he had personally "struggl[ed] with this thing." The court stated:

> Here you have got a will be four-year-old . . . child who has lost [his] relationship with mother, who has only known LaBrec as father for the entire — entirety of his life for that matter, who, in fact, faces the possibility of even losing — being snatched from that relationship. . . .

Obviously frustrated, the court noted, "I don't care what the . . . black letter law says, I think that is just horrible." Nevertheless, the trial court felt constrained by *In re Baby Girl Eason.*

Relying upon *Eason,* supra, the trial court determined that Davis 'had "not waived his 'opportunity interest' to develop a relationship with his child." The court declared Denver LaBrec "to be the legitimate son of Jonathan R. Davis," with inheritance rights from Davis, and pronounced that "henceforth the name by which said child shall be known shall be DENVER JAMIN DAVIS." After legitimating Denver as the biological offspring of Davis, the court granted Davis limited visitation rights of every other Saturday or Sunday, provided that he gave 24 hours notice to LaBrec. The court ordered Davis and LaBrec to keep each other notified at all reasonable times as to the child's whereabouts.

1. LaBrec claims that the trial court erred in finding that Davis had not abandoned his opportunity to bond with the child after he was informed of his paternity. We agree.

The threshold inquiry must be whether *Eason,* upon which the trial court and the dissent rely, controls our analysis of this situation. While *Eason* provides an analytical framework, the Supreme Court recognized in that case that its holding could not be applied across the board to every set of facts that might be presented. In fact, the Supreme Court expressly noted in *Eason* that the existence of an established familial bond could require consideration of the best interest of the child rather than simply the fitness of the biological parent. Here, established familial bonds exist.

In *Eason,* the Supreme Court considered the rights of unwed biological fathers against the rights of strangers who wished to adopt. *Eason* made no mention of a situation in which the rights of a legal father (LaBrec) who legitimated the child, gained custody, and was raising him were being challenged by the apparent biological father (Davis). The dissent overlooks the critical fact that it is LaBrec who is the parent of Denver as a matter of law and as a matter of fact. To apply *Eason* in the mechanical fashion advocated by the dissent would create an anomaly: Davis (the apparent biological father) then

would be totally precluded from challenging LaBrec's legal status as Denver's father *unless* he could prove by clear and convincing evidence that LaBrec (the legal father) is unfit. Such an approach would violate principles of fundamental fairness by affording no opportunity whatsoever for consideration of the best interest of the child, including any potential role of Davis in his life.

In *Eason*, supra, the Supreme Court held that

> unwed fathers possess an opportunity interest protected by due process of law. If timely and diligently pursued, and not abandoned, this opportunity interest will lead an unwed father in [these] circumstances to enjoy the benefits of custody and entitle him to equal treatment under law accorded other parents. Thus, we hold because Georgia law affords an unwed mother a fitness test or veto power under the circumstances it must also afford [an unwed biological father] a fitness test or veto power, *provided he has not abandoned his opportunity interest.*

(Footnote omitted; emphasis in original.) Id. at 297 (1). But in *Eason*, unlike here, the unwed biological father did not delay nearly three years in filing a proper petition to legitimate.[5] On the contrary, in *Eason*, about two months after the baby's birth, the biological father sought to legitimate the infant. Despite the biological father's seemingly prompt action in filing a petition to legitimate, the Supreme Court remanded the case for a determination as to whether the father had, in fact, abandoned his opportunity interest "through his conduct with regard to Eason and the child and otherwise." Id. The court noted that only if the biological father had not abandoned his opportunity interest, would the appropriate test be his fitness as a parent to have custody. Id.

As this court noted in *Turner v. Wright*, 217 Ga. App. 368 (1) (457 SE2d 575) (1995), the opportunity interest of an unwed biological father to develop a relationship with a child begins at conception. Davis's "opportunity interest" commenced in August 1994 about nine months before Denver's birth. Yet the evidence is undisputed that Davis did nothing to timely and diligently avail himself of his opportunity interest for nearly three years and failed to file the underlying action until August 1997. Davis offered no evidence to suggest he ever attempted to ascertain whether the unprotected intercourse in which he admittedly engaged with Wolff had culminated in a pregnancy.

Wolff told Davis of his parentage no later than December 5,

---

[5] In June 1997, Davis improperly filed the action in Gwinnett County despite the fact that LaBrec was living with Denver in DeKalb County.

1996, two months before LaBrec's pending custody action became final. Davis did not bother submitting to blood testing to verify his parentage until more than six months later. Wolff's affidavit claiming that Davis gave money to her (not for the child) whenever she asked is vague as to details of the amounts, frequency, and purpose and is not independently corroborated by financial documentation. While this evidence certainly would support a finding that Davis slept on his rights and effectively abandoned his opportunity interest by not intervening in the custody action or timely taking another action, it does not demand a finding that Davis has forfeited all opportunity to be Denver's father. An unwed biological father's "opportunity interest" as used in the context of a legitimation proceeding has a distinct legal meaning. See *Eason*, supra. By no means are we saying that Davis has lost his "opportunity" to be Denver's father. On the contrary, that determination should be made and must be made by the trial court based on the best interest of the child.

Even if we assume, as does the dissent, that the clock did not start ticking on Davis's "opportunity interest" until December 5, 1996, when Wolff told him that he was Denver's father, the record contains no evidence that Davis immediately attempted to locate the precise whereabouts of Denver, contacted any court in this State, or otherwise took appropriate legal action, until filing a lawsuit against LaBrec in August 1997, more than eight months after being informed of his paternity.[6]

In a recent case, this court upheld a finding that due to the biological father's inaction during the mother's pregnancy and for two months after the child's birth, the father had "abandoned his opportunity interest to develop a relationship with the child." *In the Interest of D. S. P.*, 233 Ga. App. 346, 349 (2) (504 SE2d 211) (1998). Inaction and passivity simply cannot suffice to demonstrate the requisite diligence of an unwed biological father in pursuing the opportunity interest to parent a young child, a child growing increasingly more attached daily to another person who has fully assumed the parental role as the child's father. Id. Davis claims to have relied upon Wolff to bring the child to Missouri, but after Davis became aware of legal proceedings in another state, he could not just sit back and await the outcome.

The dissent's reliance upon *Doe v. Chambers*, 188 Ga. App. 879

---

[6] Although Davis seeks to excuse his inaction by stating that he was out of the country during much of the time after December 5, 1996, the record indisputably indicates that Davis was not in Guam but was in Rolla, Missouri, on April 22, 1997. In his brief, LaBrec asserts that Davis admitted in his deposition that during her pregnancy Wolff told him that the baby might be his. But no copy of that deposition has been included in the appellate record.

(374 SE2d 758) (1988) is misplaced. In that case, when the biological father learned of the birth of his child two months after the fact, he "then vigorously pursued his opportunity . . . to establish his parental relationship." Id. at 880. Also, in *Doe*, there was no prior order legitimating the child as another man's. Here, Davis cannot show that he vigorously pursued the chance to establish his parental relationship, when, in fact, he failed to take any legal action and did not even file suit until more than eight months had elapsed.[7] Nor can we agree with the dissent that Davis's pending military service constituted a bar to action or excused his passivity. The dissent cites no law and we know of none that would support the proposition that Davis could justify his inactivity by supposedly relying upon Wolff to act to protect his interests.

Moreover, the dissent misconstrues portions of Wolff's testimony. Wolff did not testify that she assured Davis she would return with the child to Missouri. Rather, she attested, "That I informed Plaintiff that I was in the process of bringing his child back from Georgia and that I would cooperate in his legitimation of his son when I returned." Further, Wolff's testimony that she did not "provide him with information sufficient for him to intervene in said action" and "he accepted responsibility for his son" are unsupported legal conclusions lacking in probative value. *Reid v. City of Hogansville*, 202 Ga. App. 131, 133 (1) (413 SE2d 457) (1991). Nor is it clear how the dissent can find "due diligence" when the undisputed evidence shows that Davis delayed over four and a half months *after* December 5, 1996, before finally submitting to DNA testing.

The dissent ignores the fact that it was Davis's obligation to proceed vigorously and diligently to avoid forfeiting his opportunity interest. Compare *Doe*, supra. In these circumstances, we find the trial court erred in finding Davis had not abandoned his opportunity interest. See *In the Interest of D. S. P.*, supra. This finding, however, does not end the matter. It means that on remand, if the trial court determines the earlier order of legitimation can be set aside and reaches the issue of custody, it must do so on the basis of the best interest of the child as discussed more fully below.

2. LaBrec contends the trial court erred in legitimating Davis as the legal father and misapplied the analysis enunciated in *In re Baby Girl Eason*, supra, by not inquiring into and applying the best interest of the child standard. We agree.

In *Eason*, the Supreme Court considered several possible scenarios involving unwed biological fathers. The court recognized the

---

[7] In fact, some of the subsequent delay in the process was directly attributable to Davis who sought and obtained a continuance of the case from July 1998 to "sometime in September or October," to save him time and money.

existence of a continuum: At one end is a father who clearly takes on parental duties and forms emotional bonds with the children, as in *Stanley v. Illinois*, 405 U. S. 645 (92 SC 1208, 31 LE2d 551) (1972), and at the opposite extreme is a father who does not live with the mother after the child's birth, never offers to marry, does not support the child, and fails to register as the father as required by state law. *Lehr v. Robertson*, 463 U. S. 248 (103 SC 2985, 77 LE2d 614) (1983).

The Supreme Court of Georgia carefully differentiated between undeveloped parent-child situations and developed ones, recognizing significant distinctions:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he acts as a father toward his children. *But the mere existence of a biological link does not merit equivalent constitutional protection*. The actions of judges neither create nor sever genetic bonds. The importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children.

(Citation and punctuation omitted; emphasis supplied.) *Eason*, supra at 295-296.

In *Eason*, the Supreme Court addressed the rights of an unwed, biological father pitted against the rights of a genetically unrelated couple desiring to adopt his child. But in *Eason*, unlike here, no long-standing parent-child relationship had been formed, and no legitimation order had already been entered. Moreover, the court noted in *Eason*, that the best interest standard may be used in certain circumstances. These are such circumstances: a family had been established, Denver had been legitimated, and a father-son relationship had been created. When Denver's mother became unable to care for him, LaBrec stepped forward and assumed full parental responsibility for rearing Denver. LaBrec, not Davis, provided emotional and financial support to Denver, nurturing the child while raising him in a single-parent home. No evidence suggests otherwise.

LaBrec not only made a full commitment to the parental duties and responsibilities for rearing Denver, but also undertook legal action to legitimate Denver as his son. OCGA § 19-7-43 is expressly designed for the specific purpose of determining and establishing paternity. *Dept. of Human Resources v. Fleeman*, 263 Ga. 756, 758

(439 SE2d 474) (1994). The appearance on the certificate of birth of the name of the father, entered with his written consent, creates a rebuttal prima facie case establishing paternity. OCGA § 19-7-46.1 (a). By law, LaBrec became Denver's "legal father" after legitimating Denver in compliance with the procedures of OCGA § 19-7-22. See OCGA § 19-8-1 (6) (E).

Upon legitimation, a father stands in the same position as any other parent as to custody of his child. *Sims v. Pope*, 228 Ga. 289, 291 (185 SE2d 80) (1971). The father of a child rendered legitimate by court order has a claim to parental and custodial rights with respect to his child. *Mitchell v. Ward*, 231 Ga. 671, 672 (203 SE2d 484) (1974). This court has held repeatedly that public policy is not advanced by " 'the disestablishment of legitimacy and paternity.' " See *Grice v. Detwiler*, 227 Ga. App. 280, 283 (488 SE2d 755) (1997). The dissent implicitly suggests we ignore this entire body of law.

In another case with similarly disturbing facts, this court observed:

> Paternity and legitimation are not the same thing. Biology is not destiny, and a man has no absolute right to the grant of his petition to legitimate a child simply because he is the biological father. Instead, we have held time and time again that the court *must* consider the best interest and welfare of the child before granting a legitimation petition, and that it is not bound by the desires and contentions of the biological parents.

(Citations omitted; emphasis in original.) *Ghrist v. Fricks*, 219 Ga. App. 415, 420 (1) (465 SE2d 501) (1995). "[W]hile OCGA § 19-7-43 provides a means for establishing paternity, no such statute provides for the disestablishment of paternity." Id. at 419. This court noted that public policy would not permit "a mother and an alleged father to enlist the aid of the courts to disturb the emotional ties existing between a child and his legal father after sitting on their rights for the first three years of the child's life." Id. " 'Once there has been a final determination of paternity, a party may not relitigate that issue without first showing, inter alia, that his failure to contest paternity earlier was not the result of a lack of due diligence. [Cit.]' " *Dept. of Human Resources v. Browning*, 210 Ga. App. 546, 548 (1) (b) (436 SE2d 742) (1993).

Davis did not make this showing. He delayed action, and by the time he filed his petition seeking to legitimate Denver and seeking custody of him, a developed familial relationship and emotional bonds had already been formed between Denver and LaBrec. Yet when ruling on Davis's complaint seeking to legitimate Denver, the

trial court apparently failed to consider Davis's delay, the legal effect of the prior court order legitimating Denver as the child of LaBrec, or whether the disruption of the existing stable family consisting of LaBrec and Denver would exceed any benefit which might otherwise flow to the child. See *In the Matter of J. M. S.*, 257 Ga. 630, 631 (362 SE2d 56) (1987). No evidence of fraudulent conduct on the part of LaBrec in legitimating Denver has even been suggested. Compare *Clements v. Phillips*, 235 Ga. App. 588 (510 SE2d 311) (1998) (mother participated in fraudulent scheme to have child legitimated by someone other than his father). In fact, we question whether Wolff can be permitted to contradict the earlier testimony she apparently made in the legitimation proceeding in Gwinnett County. *Reagan v. Lynch*, 241 Ga. App. 642, 643-644 (524 SE2d 510) (1999) (doctrine of judicial estoppel prevents manipulation of judicial system through use of divergent sworn positions). See *Kaiser v. Kaiser*, 195 Ga. 774, 777 (1) (25 SE2d 665) (1943).

The dissent overlooks the inevitable consequences of affirming the existing order. Under this order, Denver became the child of Davis and his surname was changed to Davis. Without question, Davis seeks to eliminate LaBrec's custody of Denver and to obtain custody for himself. No consideration has been accorded to the best interest of this child, and were we to embrace the dissent's argument, no consideration would ever be made. Not even a strained reading of *Eason*, supra, would dictate such a result.

We therefore vacate the order that declares Denver to be "the legitimate son of Jonathan R. Davis." On remand, as a threshold matter, if the July 15, 1996 order entered by the Superior Court of Gwinnett County legitimating Denver as LaBrec's child has not been set aside, then the trial court must consider the preclusive effect of a valid preexisting order.[8] *Patterson v. Whitehead*, 224 Ga. App. 636, 638 (2) (481 SE2d 621) (1997). See *Macuch v. Pettey*, 170 Ga. App. 467 (1) (317 SE2d 262) (1984). We emphasize that,

> generally judgments and orders shall not be set aside or modified without just cause and, in setting aside or otherwise modifying judgments and orders, the court shall consider whether the rights have vested thereunder and whether or not innocent parties would be injured thereby.

OCGA § 9-11-60 (h).

In the event that the trial court determines that it can properly

---

[8] In the order entered on June 2, 1998, a ruling on LaBrec's motion to dismiss, the trial court noted: "[p]laintiff, the prospective father, is now attempting to establish paternity and legitimate a child who has already been legitimated by another man."

address Davis's petition, then we direct the court to determine the crucial issue of whether the delegitimation of the child's lifelong relationship with LaBrec is in the best interest of the child, considering the emotional harm such decision would have upon the child in light of Denver's established familial bonds and emotional ties with LaBrec. *Grice*, supra at 283 (delegitimation not in best interest of child); *Ghrist*, supra at 419 (after alleged father and biological mother sat on their rights for three years, public policy foreclosed judicial disturbance of the existing emotional ties between child and his legal father); *Alexander v. Guthrie*, 216 Ga. App. 460, 461-462 (1) (454 SE2d 805) (1995); *Boyd v. Harvey*, 173 Ga. App. 581, 584 (2) (327 SE2d 551) (1985); see also *Flannagan v. Cantrell*, 233 Ga. App. 547, 548 (505 SE2d 53) (1998) (physical precedent only) (best interest of the child must govern legitimation proceedings).

3. In light of the above, we need not reach LaBrec's remaining enumeration of error.

*Judgment vacated and case remanded with direction. Ellington, J., concurs. Blackburn, P. J., concurs in the judgment only. Miller, J., concurs in Division 2 and in the judgment. Pope, P. J., Andrews, P. J., and Ruffin, J., dissent.*

POPE, Presiding Judge, dissenting.

I must respectfully dissent from the majority opinion. In *In re Baby Girl Eason*, 257 Ga. 292 (358 SE2d 459) (1987), the court stated: "unwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected." Id. at 296. Although the father may abandon this interest, "[a]bsent an abandonment of his interest, a state *may not* deny a biological father a reasonable opportunity to establish a relationship with [the] child." (Emphasis supplied.) Id. In this case, I agree with the trial court that the biological father did not abandon his opportunity interest in the child. Furthermore, I agree with the trial court that the appropriate standard to use in determining Davis's right to legitimate his child is his *fitness* as a parent to have custody of his child.

1. The majority finds that "Davis's 'opportunity interest' commenced in August 1994 about nine months before Denver's birth." Under the facts of this case, I cannot agree with this conclusion. The evidence shows that Davis did not learn of Denver's existence until December 5, 1996. At the time of Denver's birth, LaBrec, not Davis, believed the child to be his. Wolff did not tell LaBrec otherwise, nor did she tell Davis that she was carrying or had given birth to his son at that time. The record is simply devoid of evidence that Davis knew

or should have suspected that Wolff had given birth to his son.[9] The fact that Davis did nothing at that time to exercise his opportunity interest is thus not surprising. It defies logic and common sense to say, as does the majority, that the period of time in which Davis knew nothing of his son should be considered in determining whether Davis waived his opportunity interest. And the majority's reliance on cases which say the opportunity interest begins at conception is somewhat misleading because in those cases the evidence clearly showed that the biological father knew about the child from conception or birth. For example, in *Turner v. Wright*, 217 Ga. App. 368, 369 (457 SE2d 575) (1995), the issue was whether the father's actions during the mother's pregnancy constituted a disregard of his opportunity interest. After simply noting that the biological father's opportunity interest begins at birth, the court went on to consider the father's actions *"after [he] was aware* he was to be a father." (Emphasis supplied.) Id. The majority cites no cases, and I have found none, in which our appellate courts have held that the period of time to be considered in determining whether the biological father has abandoned his opportunity interest should include the period of conception when the father did not know a child had been conceived. To the contrary, this court has previously held that evidence that a biological father was unaware of the pregnancy or birth is relevant in determining whether the biological father abandoned his opportunity interest. *Doe v. Chambers*, 188 Ga. App. 879, 880 (1) (374 SE2d 758) (1988) (father who did not learn of child's birth until she was two months old found not to have abandoned opportunity interest); *Alexander v. Guthrie*, 216 Ga. App. 460 (1) (454 SE2d 805) (1995) (father, who was aware mother of the child was pregnant and of the birth of the child, lost his opportunity interest by committing crimes resulting in his incarceration).

It follows that the relevant date for determining whether Davis waived his opportunity interest is December 5, 1996, when Wolff told Davis he had a son. Although the majority asserts Davis's response to the news was inaction and passivity, I do not agree with that characterization. According to Wolff, when she told Davis about his son, he "accepted responsibility for his son, indicated his desire to have a blood test to establish paternity, and sent me money when I asked for it." Wolff further averred that she "did not serve [Davis] with formal notice of the custody action pending in Georgia concerning his son,

---

[9] As noted by the majority in footnote 6, LaBrec's assertion in his brief that Davis may have had some knowledge about the pregnancy and the paternity of the child is unsupported by record citation and nothing I have found in the record supports that assertion. I would further note that although LaBrec's brief contains numerous factual representations, it contains no citations to the record, in violation of Court of Appeals Rule 27 (a) (1).

nor did I provide him with information sufficient for him to intervene in said action." In any event, Wolff averred that she had "informed" Davis that she would return with the child to Missouri and "cooperate" with legitimation proceedings. Although the majority asserts that Davis could not justify his "inactivity" by relying on the mother to protect his interest or that his pending military service did not excuse his "passivity," I believe this conclusion somewhat ignores the reality of the situation. As I read the majority, upon learning he was a father, Davis was supposed to take immediate legal action or lose his opportunity interest to be a father to his child. But this is not a situation where Davis knew months before the child's birth that he was going to be a father. And the record does not indicate that he understood the significance of the legal proceedings that were ongoing in Georgia or knew that because of those proceedings he had to act quickly or lose substantial rights in legitimating his child. And during this time the mentally unstable mother of the child was continuing to mislead both Davis and LaBrec, as well as the court. Surely a father in Davis's position and in these circumstances should be accorded some opportunity to assimilate the information he has received and to determine what his next legal step should be. And I cannot simply ignore the fact that Davis's military service would have some impact on his ability to deal with his situation. In sum, unlike the majority, I believe the circumstances surrounding the particular situation must be considered in determining whether a biological father has timely pursued his opportunity interest and nothing about this case convinces me the father lost his opportunity here. Given the circumstances, I believe that the trial court correctly determined that Davis did not abandon his opportunity interest, and the majority should not second-guess the trial court's finding.

2. I also disagree with Division 2 of the majority opinion. The court in *In re Baby Girl Eason* held that if the biological father "has not abandoned his opportunity interest, the standard which must be used to determine his right to legitimate the child is his fitness . . . to have custody of the child." Id. at 297. See also *Turner v. Wright*, 217 Ga. App. at 369-370 (2); *Doe v. Chambers*, 188 Ga. App. at 880 (1). "In such a case, the parent is entitled to custody of the child unless the third party shows by clear and convincing evidence that the parent is unfit." (Citations and punctuation omitted.) *Turner v. Wright*, 217 Ga. App. at 370.

Thus, the trial court properly applied the fitness standard in this case, and I disagree with the majority's conclusion that the trial court erred by not inquiring into and applying the best interest of the child standard. LaBrec established a relationship with the child, sanc-

tioned by the court,[10] because he believed he was the child's father; Davis did nothing to intervene in that relationship or to establish his own relationship with Denver because he did not know the child existed. All of this happened because the mentally unstable mother of the child misled LaBrec, Davis and the court concerning the child's paternity. Even reading *In re Baby Girl Eason* to hold that the standard to be applied when dealing with an unwed biological father who has not lost his opportunity interest should be decided on a case-by-case basis, I do not believe the facts of this case mandate application of the best interest standard. In this regard I note that the trial court's order does not sever the relationship with LaBrec; it simply allows the child's biological father the opportunity to develop a relationship with his child. I would not deny either the father or the child this opportunity. And because I find no merit to LaBrec's remaining argument on appeal, I would affirm the trial court's order.

I am authorized to state that Presiding Judge Andrews and Judge Ruffin join in this dissent.

DECIDED MARCH 30, 2000 — 

*Lawrence D. Kupferman, Gregory D. Golden*, for appellant.
*Fred L. Cavalli, M. Ayres Gardner*, for appellee.

---

[10] Although the majority states on page 307 that LaBrec has been raising Denver since birth, it appears that Wolff was raising the child for the first year of his life and that LaBrec did not seek to legitimate Denver until he was slightly over a year old. Moreover, it also appears that LaBrec may have had reason to suspect that he was not Denver's father prior to the February 1997 custody order.