## A04A2311. BOWERS v. PEARSON.
### (609 SE2d 174)

PHIPPS, Judge.

Margaret Pearson and David Bowers are the parents of a child born out of wedlock. Although Pearson informed Bowers that she was pregnant, she refused to discuss the pregnancy with him and, in consultation with her parents, decided to place the child for adoption. Shortly before the child's birth, Bowers filed a petition to legitimate the child.[1] The trial court denied the petition, effectively finding that Bowers had abandoned his opportunity to develop a relationship with the child by failing to provide financial or other support to Pearson during the pregnancy. We conclude that the trial court's finding of abandonment is not supported by the evidence and reverse.

In his petition, Bowers stated that he believed himself to be the child's biological father; that he wished to submit to a paternity test; and that, if the results of the test established him as the biological father, he wanted to be declared the legitimate father of the child with all of the rights and responsibilities of a legal father. Pearson filed a timely answer to the petition objecting to it on a number of grounds. At or about the time she filed her answer, Pearson gave birth to the child. Paternity testing later confirmed that Bowers is the child's biological father. Several months after the child's birth, the case came on for a hearing. At the hearing, it was shown that shortly after the child was born, she was placed for adoption with Joe and Tina Ragland.

Testimony given at the hearing, held in November 2003, showed that Bowers was then twenty-five years old; that he had been a member of the United States Army for three years; and that he worked as a helicopter mechanic, was stationed at Hunter Army Air Field in Savannah, was enlisted until 2006, and was subject to being deployed at any time. Although he lived in the barracks on the air field, he had purchased a house in Savannah, and his mother was relocating there from California to help care for the child if he were awarded custody.

At the time of the hearing, Pearson was 18 years old. She was a student at Valdosta State College and was being supported by her

---

[1] See OCGA § 19-7-22.

parents. Bowers and Pearson had met in 2002, when Pearson was a high school honors student in Savannah. They dated for about one month, and Pearson became pregnant. In November 2002, about one week before the relationship ended, Bowers learned of the pregnancy through a telephone call from Pearson. Bowers testified that he made several attempts to discuss the matter with Pearson and her parents on the telephone, but they refused to talk to him about it.

In June 2003, Bowers filed the legitimation petition. The child was born the following month. Pearson and her parents decided that the child's best interest would be served by placing her for adoption, and her prospective adoptive parents were given physical custody of the child within days after her birth.

Following the hearing, the trial court denied Bowers's petition finding that his legitimation of the child would not be in her best interest. Bowers moved for a new trial. Among other things, he argued that the trial court had applied the incorrect legal standard for determination of the issue of legitimation by using the "best interests of the child" standard in the absence of evidence of parental unfitness or abandonment of opportunity by him. The trial court denied Bowers's motion for new trial, in effect finding that although as an unwed biological father, he did have a constitutionally protected opportunity to develop a relationship with his child, he had abandoned that opportunity by failing to provide financial or other assistance to Pearson during her pregnancy and delivery. We granted Bowers's application for discretionary appeal.

Our analysis of this case begins with the decision of the Supreme Court of Georgia in *In re Baby Girl Eason*.[2] There, as here, an unwed biological father sought to legitimate a child over the objections of the mother and of the married couple with whom the child had been placed for adoption. In that case, as in this one, the child was born as a result of a brief relationship between the parents. Before the child's birth, the father in *Eason* learned of the pregnancy but moved from Georgia to California; after being given notice of the commencement of adoption proceedings, he filed a petition for legitimation.

The primary issue in *Eason* concerned the extent to which an unwed biological father has a federal constitutional right to legitimate his child. Examining a number of applicable decisions of the Supreme Court of the United States, the Court found that "there exists a continuum of unwed father-child relationships with assigned degrees of protection afforded rights to custody."[3] "At the highest level are those relationships which have been fully developed through

---

[2] 257 Ga. 292 (358 SE2d 459) (1987).
[3] Id. at 294 (1).

present or past custody."[4] At the other end of the spectrum "there are other unwed fathers who have developed no relationship with their children. Their only connection is biological."[5] As the Court in *Eason* explained,

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. . . . [U]nwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected. This opportunity interest begins at conception and endures probably throughout the minority of the child. But it is not indestructible. It may be lost. . . . It is . . . an interest which can be abandoned by the unwed father if not timely pursued. On the other hand it is an interest which an unwed father has a right to pursue through his commitment to becoming a father in a true relational sense as well as in a biological sense. Absent abandonment of his interest, a state may not deny a biological father a reasonable opportunity to establish a relationship with his child.[6]

In *Eason*, the parties provided contradictory testimony whether the father had left the state before the birth of the child without providing the mother a means of contacting him and whether he had offered to provide the mother with financial support during her pregnancy.[7] The Court thus found that the evidence was in conflict whether the father had abandoned his opportunity interest.[8]

The Court concluded that if the father had not abandoned his opportunity interest, "the standard which must be used to determine his right to legitimate the child is his fitness as a parent to have custody of the child. If he is fit he must prevail."[9] Importantly, in *Eason*, the relationship between the adoptive parents and the child had not taken place "in the absence of state participation," in that

---

[4] Id.

[5] Id. at 295.

[6] (Citation and punctuation omitted.) Id. at 296.

[7] Id. at 292-293.

[8] Id. at 297.

[9] Id.

"[t]he adoption laws were being pursued through the courts and . . . account[ed] for the placement of the child with the adopting parents."[10] Absent those facts, the Court cautioned that the circumstances of the case "might permit a best interests test to be used."[11]

Several months after deciding *Eason*, the Supreme Court held in *In the Matter of J. M. S.*[12] that the trial court had not erred in applying a best interest of the child standard where an unwed biological father sought to legitimate a child. But the evidence there showed that the father had effectively abandoned his opportunity to develop a relationship with the child, during which time the mother had remarried and formed a stable and loving home environment where the child's needs were being met.[13]

In *Ghrist v. Fricks*,[14] a child was born during wedlock. The mother, however, later left her husband for a man with whom she had been having an extramarital affair. In the divorce proceeding, the mother obtained an adjudication that her husband was the child's father and she was awarded child support. The mother then married her former lover, who submitted to a paternity test showing that he was the child's biological father. A petition was then brought to in effect de-legitimate and then relegitimate the child. Under these "unusual" facts, we held that the petition should have been dismissed on public policy grounds.

*Davis v. LaBrec*[15] was another effort by a biological father to de-legitimate a legitimate child after the mother revealed the child's true parentage after she became estranged from the legal father. The trial court relied exclusively on *Eason* in holding that if the child's biological father had not waived his opportunity to develop a relationship with the child and was fit, it was required to grant the petition to legitimate. Our Supreme Court found *Eason* factually distinguishable because the child in *Davis* already had a legal father with whom he had developed a father and son relationship. Moreover, the Court reasoned that *Eason*

> does not stand for the proposition that the fitness test is the substantive standard applicable to every legitimation petition but recognized a continuum of rights, specific to the facts of each case, to which varying standards could be applied. In *Eason*, an unwed biological father sought to

---

[10] Id.
[11] Id.
[12] 257 Ga. 630 (362 SE2d 56) (1987).
[13] See also *Mabry v. Tadlock*, 157 Ga. App. 257 (277 SE2d 688) (1981).
[14] 219 Ga. App. 415 (465 SE2d 501) (1995).
[15] 274 Ga. 5 (549 SE2d 76) (2001).

legitimate his infant child who had been placed with an adoptive family by the State. The adoptive family had developed a relationship with the infant and were providing normal parental care and maintenance. We held that the parental fitness standard must be used to determine the father's right to legitimate the child because it was the State's action which interfered with the father's rights with respect to the child and which allowed for the development of the parent/child relationship between the child and the adopting parents. We made clear, however, that absent the State's involvement and under other circumstances, the best interests of the child standard would be adequate.[16]

In *Eason*, the mother placed the child with an agency for adoption, after which the prospective adoptive parents acquired physical custody of the child and petitioned for adoption.[17] The record in this case reflects that here, too, the adoption was being handled by an adoption agency; and that the Raglands petitioned to adopt the child in the county in which the adoption agency was located, but the adoption proceedings were dismissed after the paternity test established Bowers as the biological father. Factually, therefore, this case is similar to *Eason*. Moreover, Bowers filed his legitimation petition before the child's birth; Pearson, vested by state law with exclusive control over the not-yet-legitimated child,[18] made a unilateral decision to place the child for adoption; and, if not abandoned by him, Bowers's opportunity to develop a relationship with the child will be lost through the action of the court in denying his petition to legitimate. Under the circumstances, there is sufficient state action to compel use of the fitness standard in determining Bowers's right to legitimate the child absent abandonment of his opportunity interest.

In our opinion, the evidence does not support a finding that Bowers abandoned his opportunity interest by failing to provide financial or other assistance to Pearson during her pregnancy. Bowers testified that Pearson informed him of her pregnancy shortly before their relationship ended. Neither Bowers nor Pearson testified as to why the relationship ended or who caused the breakup. Bowers further testified that he tried to discuss the pregnancy with Pearson and her parents but they refused to discuss the matter with him. Although Pearson's father denied that Bowers had attempted to discuss the subject with him, Pearson did not dispute Bowers's

---

[16] (Citations omitted.) Id. at 6-7.

[17] *Eason*, supra at 292.

[18] See OCGA § 19-7-25.

testimony. Moreover, Pearson admitted that she did not seek any assistance from Bowers during her pregnancy, because she did not want any contact with him or any input from him concerning the pregnancy. And Pearson's father acknowledged that he disapproved of Bowers and did not ask for anything from him or want any involvement by him as "it would be counterproductive in the adoption." Bowers instituted this legitimation proceeding and simultaneously filed a registration form with the Georgia Putative Father's Registry before the child's birth. By bringing this suit, Bowers agreed to assume all the responsibilities of the child's legal father and submitted to a claim by Pearson for recovery of birthing expenses.[19] Under the circumstances, Bowers did not abandon his opportunity to develop a relationship with the child by failing to offer financial or other pregnancy-related assistance to Pearson beforehand.[20]

In finding otherwise, the trial court relied on *In the Interest of D. S. P.*[21] and *Turner v. Wright*,[22] two cases in which it was determined that the biological fathers had abandoned their opportunity interests to develop relationships with their children. The court's reliance on these cases is misplaced. In *D. S. P.*, the father knew the mother intended to put the child up for adoption; but he did nothing until almost two months after the child's birth and offered no financial or emotional support to the mother, even though she needed such support from him. In *Turner*, the father committed criminal acts after he became aware he was to be a father, resulting in his incarceration during the mother's pregnancy and when he filed the petition for legitimation within one month after the child's birth. We thus find *D. S. P.* and *Turner* distinguishable from this case. *Smith v. Soligon*,[23] cited by Pearson and the Raglands, is also distinguishable. In *Smith*, the unwed biological father filed a petition to legitimate his six-year-old son after the mother married another man who sought to adopt the child. Although the father had lived with the mother and child until the child was about four years old, he had never provided the child with any significant emotional or monetary support.

The judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Johnson, P. J., and Smith, P. J., concur.*

---

[19] See *Coxwell v. Matthews*, 263 Ga. 444 (435 SE2d 33) (1993).
[20] See *In the Matter of the Adoption of Doe*, 543 S2d 741 (Fla. 1989).
[21] 233 Ga. App. 346, 347-349 (2) (504 SE2d 211) (1998).
[22] 217 Ga. App. 368, 369 (1) (457 SE2d 575) (1995).
[23] 254 Ga. App. 172, 173-174 (2) (561 SE2d 850) (2002).

DECIDED JANUARY 7, 2005.

*Douglas G. Andrews*, for appellant.
*James C. Metts III*, for appellee.
*Dubberly & McGovern, Joseph D. McGovern*, amicus curiae.