## A99A1394, A99A1395. BUFORD-CLAIRMONT COMPANY, LTD. v. CATO CORPORATION; and vice versa.

(526 SE2d 104)

BLACKBURN, Presiding Judge.

In this action involving a commercial lease dispute, Buford-Clairmont Company, Ltd., the lessor, appeals the trial court's partial grant of summary judgment to Cato Corporation, the lessee, contending that the trial court erred by: (1) determining as a matter of law that Cato had a valid right to close its store in the leased premises and (2) finding that Cato did not fraudulently induce Buford-Clairmont to enter into an amendment of the original lease agreement between the parties. Cato cross-appeals, contending that the trial court erred by: (1) finding, with regard to the store closing issue, that a question of fact remained with regard to Cato's underlying intentions in deciding to close the store and (2) holding that Cato was estopped from terminating the lease.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant [or denial] of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

On June 10, 1994, Buford-Clairmont and Cato entered into a commercial lease agreement pursuant to which Cato leased space in Buford-Clairmont's shopping center to house a store which sold women's apparel. Article 28 of the lease provides:

> LESSOR covenants and agrees that during the term of this Lease and any extensions or renewals thereof, should LESSOR directly or indirectly enter into any leases in the Shopping Center, or any enlargement thereof, including any outparcels, with any national or regional women's apparel chain stores classified as popular priced and carrying competitive merchandise, with any store specializing in large-sized women's apparel, or with more than one store special-

*izing in specific price point sales of ladies' and girls' apparel . . . in such event, the monthly fixed rent shall be reduced by one-half . . . that set forth herein for the initial Lease period and any extension or renewal thereof, or LESSEE, at its option, may elect to cancel this Lease upon sixty (60) days notice in writing.*

On October 5, 1994, Buford-Clairmont entered into a lease with Simply Fashion Stores, Ltd., a competitor of Cato, and, approximately two months later, Cato notified Buford-Clairmont that it believed Article 28 had been violated and that it would begin paying half of the rental amounts stipulated in the contract. On November 30, 1995, Buford-Clairmont sued Cato for failing to pay the full amount of rent and sought a declaratory judgment that it had not violated Article 28.

After negotiations, the parties agreed to settle this lawsuit and, through correspondence, devised an amendment to the lease between the parties (the First Lease Amendment).[1] This amendment altered the rental payments for the period of September 1, 1996 through January 31, 1998, changing them from a fixed amount to an amount based on a percentage of sales. Article 1 of the First Lease Amendment provides:

Effective as of September 1, 1996 through January 31, 1998, LESSEE's obligation to pay fixed rent under the Lease, shall abate and in lieu thereof LESSEE shall pay LESSOR, on a monthly basis, an amount equal to four and one-half percent . . . of gross retail sales, *if any*, as defined in the Lease, made from the Premises, payable within thirty (30) days after the end of each month.

(Emphasis supplied.)

Cato prepared the First Lease Amendment, the material terms of which Buford-Clairmont suggested, and forwarded it to Buford-Clairmont, which executed the document. However, Cato subsequently refused to sign the amendment, and Buford-Clairmont brought an action to enforce the settlement agreement before the Superior Court of Fulton County. On January 21, 1997, that court determined that the settlement, as reflected by the First Lease Amendment and correspondence between the parties, was binding, and attorney fees were imposed on Cato. On January 30, 1997, Cato mailed notice to Buford-Clairmont that it had decided to close its

---

[1] In addition, Cato agreed to pay Buford-Clairmont the lump sum of $13,928.25, which was equal to seven months half-rent.

store due to operational decisions and that it was exercising its option under Article 28 to terminate the lease.

Buford-Clairmont subsequently brought this action against Cato, contending that: (1) Cato breached the lease by closing its store; (2) Cato fraudulently induced Buford-Clairmont into the First Lease Amendment; and (3) Cato damaged the property during its tenancy.[2] Buford-Clairmont also sought a declaratory judgment that Article 28 of the lease had not been violated. Cato counterclaimed, contending that Buford-Clairmont had breached the lease by renting to a competitive retailer and requested a declaratory judgment to that effect.

## Case No. A99A1394

1. Buford-Clairmont contends that Cato had no right to cease store operations, arguing that the imposition of rent based on percentage sales carried with it an implied agreement to stay open. This contention is untenable, as the lease agreement explicitly provides Cato with the right to close its store.

Article 12 of the lease provides:

> The Premises may be occupied only for the purpose of the display and sale of ladies' and girls' apparel, accessories and allied lines commonly sold from time to time in THE CATO CORPORATION affiliated stores. *Nothing in this Lease shall be deemed to constitute an obligation on the part of Lessee to operate its business in the Premises at any time.*

(Emphasis supplied.) The execution of the First Lease Amendment did not vitiate this provision, as Buford-Clairmont argues, because Article 6 thereof states: "Except as herein amended, all other terms, conditions and covenants of the Lease shall remain unchanged and continue in full force and effect." Cato retained the right to close its store following the execution of the First Lease Amendment, and Buford-Clairmont's reliance on alleged implied provisions cannot withstand the mandate of contradictory express provisions. Moreover, the First Lease Amendment links rental payments to a percentage of sales, *if any*, and thereby explicitly undermines Buford-Clairmont's argument even further. Despite Buford-Clairmont's pleas, this Court has no choice but to follow the explicit language of the lease agreement, and Buford-Clairmont must suffer the consequences of its voluntary acceptance of what ultimately turned out to be a bad business deal.

---

[2] This issue is not before this Court on appeal.

2. Buford-Clairmont contends that Cato fraudulently induced it into entering the First Lease Amendment, arguing that Cato knew it was going to close the store at the time the amendment was negotiated and sought a percentage calculation to avoid being responsible for any rent. Again, this argument is untenable.

"The tort of fraud in Georgia has five elements: (1) false representation by defendant; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff." *Westminster Holdings, Ltd. v. Weatherspoon*, 237 Ga. App. 819, 822 (2) (517 SE2d 80) (1999).

Pretermitting the factual issue of whether Cato decided to close its store prior to the execution of the lease amendment, there is no evidence of record that Buford-Clairmont was induced to enter into the amendment or that it relied on any representations by Cato in doing so. To the contrary, the record shows that the percentage-based rent was *Buford-Clairmont*'s idea. Moreover, after the First Lease Amendment was drafted, Cato refused to sign or honor it, and Buford-Clairmont affirmatively brought suit to enforce the amendment. As Buford-Clairmont initiated the incorporation of percentage rent and affirmatively enforced this scheme, it cannot now claim fraud to circumvent the ramifications of its own actions. Again, Buford-Clairmont must be held to the terms of the deal it voluntarily negotiated, whether or not such deal ultimately proved beneficial.

## Case No. A99A1395

3. In its cross-appeal, Cato contends that no question of fact remained as to whether it retained the right to cease retail operations in the leased premises. We agree.

As discussed above, Article 12 of the lease agreement explicitly gave Cato a general right to cease store operations, without regard to the reason for which it chose to do so. Therefore, Cato's decision to close must be considered independent of the provisions of Article 28, which specifically deals with Cato's options in the event Buford-Clairmont leased space to a competitor — namely termination of the lease or rent reduction. Accordingly, Cato's motivation would not affect its ability to close its store, only its ability to terminate the lease agreement. Even if we were to assume that previous court decisions prevented Cato from terminating due to a violation of Article 28, the right to close remained. Therefore, the trial court erred by failing to grant summary judgment to Cato with regard to its right to close its store.

4. Cato contends that the trial court erred in finding that res judicata bars it from suing Buford-Clairmont for leasing space to a competitor. We cannot agree.

The doctrine of res judicata prevents the re-litigation of all claims which have already been adjudicated, or which could have been adjudicated, between identical parties or their privies in identical causes of action. Res judicata prevents a plaintiff from instituting a second complaint against a defendant on a claim that has already been brought, after having previously been adjudged not to be entitled to the recovery sought on that claim. Three prerequisites must be satisfied before res judicata applies[:] (1) identity of the cause of action[;] (2) identity of the parties or their privies[;] and (3) previous adjudication on the merits by a court of competent jurisdiction.

(Footnotes omitted.) *Waldroup v. Greene County Hosp. Auth.*, 265 Ga. 864, 865-866 (1) (463 SE2d 5) (1995).

[Furthermore, r]es judicata bars subsequent actions as to all matters put in issue or which under the rules of law might have been put in issue in the original action. OCGA § 9-12-40. The subject matter was identical in both actions. . . . [Cato] had a full opportunity in the first action to litigate each and every claim existing between the parties which touched on [the issue of Buford-Clairmont's violation of the lease agreement]. It was [Cato's] duty to do so.

(Citations and punctuation omitted.) *McIver v. Jones*, 209 Ga. App. 670, 673 (434 SE2d 504) (1993).

There is no question here that the parties in all actions are the same and the subject matter is identical. Furthermore, the original judgment, enforcing the settlement agreement and imposing the rental terms *as agreed upon by the parties*, was issued by a court of competent jurisdiction. Although Cato argues that, because a settlement agreement was involved, the trial court cannot be considered to have rendered a judgment on the merits, this argument is untenable. Unlike *Blakely v. Couch*, 129 Ga. App. 625 (200 SE2d 493) (1973), on which Cato relies, this case does not involve a consent judgment memorializing a settlement agreement. Rather, it involves an adversarial proceeding based on a motion to enforce a settlement agreement at which Cato could have and should have litigated all of its rights under the lease agreement, including the issue of Buford-Clairmont's breach thereof. As such, res judicata is applicable to this matter.

Moreover, we note that Article 28 of the lease provided Cato with alternative options — termination *or* reduced rent. Cato initially chose the latter and, through its settlement negotiations with

Buford-Clairmont, agreed upon favorable rental rates in place of the original lease provisions. As such, it appears that Cato intended to exercise its option to receive favorable rental rates in response to the lease with Simply Fashions, not terminate the lease agreement. If Cato intended to preserve its right to terminate the lease in response to the Simply Fashions breach, it should have raised this issue in prior proceedings centering around the same issues now raised, for res judicata prevents Cato from raising it now. *Lay Bros., Inc. v. Tahamtan*, 236 Ga. App. 435 (511 SE2d 262) (1999).

We need not address the special concurrence, as it does not conflict with this opinion and adds nothing to our analysis.

*Judgment affirmed in Case No. A99A1394. Judgment affirmed in part and reversed in part in Case No. A99A1395. Ellington, J., concurs. Barnes, J., concurs specially.*

BARNES, Judge, concurring specially.

I fully concur in the result and analysis of the majority in Divisions 1 and 2 of Case No. A99A1394, as well as Division 3 of Case No. A99A1395. Although I concur in the judgment in Division 4 of Case No. A99A1395, I write separately to elaborate on the facts and case law supporting the majority's conclusion that the "Order and Final Judgment" which enforced the parties' settlement agreement was an adjudication on the merits.

In this Order and Final Judgment, the trial court concluded that "[t]he parties entered into an enforceable settlement agreement as evidenced by correspondence dated August 21, 1996 and the First Lease Agreement" and that these documents "constitute the entire agreement between the parties." Based on this finding, the trial court ordered Cato and Buford-Clairmont "to fully and completely carry out each of their obligations under these Agreements."

The August 21, 1996 letter sent by Buford-Clairmont's counsel states: "[T]his will confirm that the parties have reached an agreement to settle *all matters* by agreeing to execute a Lease Modification Agreement. . . ." The August 21, 1996 letter sent by Cato's counsel states that "[a]fter the parties execute the lease modification agreement, counsel for the parties will execute and file mutual dismissals with prejudice with the Court." Thus, contrary to the contention of Cato, the Order and Final Judgment adjudicated all matters which were or could have been asserted by Cato in the first lawsuit. See *Basden v. Basden*, 183 Ga. App. 188, 189 (1) (358 SE2d 317) (1987) (res judicata applied to settlement agreement incorporated into final divorce decree which settled all questions of division of property); see also *Fowler v. Vineyard*, 261 Ga. 454, 456 (2) (405 SE2d 678) (1991) (holding voluntary dismissal with prejudice is an adjudication on the merits for purposes of res judicata).

Our decision in *Blakely v. Couch*, 129 Ga. App. 625 (200 SE2d 493) (1973) does not require a different conclusion in this case. In that decision, we held that a consent judgment memorializing a settlement agreement could not have res judicata effect on a subsequent litigant who was not a party to the settlement agreement. Id. at 628-629. We also recognized that "[o]ur ruling here of course in no way limits the binding effect between the participating litigants of consent verdicts and judgment based thereon." Id. at 629 (1).

DECIDED NOVEMBER 22, 1999.

*Silfen, Segal, Fryer & Shuster, Keith E. Fryer*, for appellant.
*Smith, Gambrell & Russell, Marcia M. Ernst*, for appellee.