A01A1470. COLEMAN v. GRIMES.
(553 SE2d 185)

ELDRIDGE, Judge.

This is an appeal from the Superior Court of Putnam County's decree of adoption in which the trial court terminated the parental rights of appellant Devin Patrick Coleman to his daughter, five-year-old K. C., under the aegis of OCGA § 19-8-10 (a) (1) and (b) (1) and (2) and in conjunction with permitting K. C. to be adopted by her stepfather, appellee William "Tommy" Grimes, pursuant to OCGA § 19-8-6 (1). While often steeped in emotional conflict, an appeal from an order of adoption is just as often fairly straightforward, because "in matters of adoption the superior court has a very broad discretion which will not be controlled by the appellate courts except in cases of plain abuse."[1] However, this case presents a unique set of circum-

---

[1] (Citations and punctuation omitted.) *Bateman v. Futch*, 232 Ga. App. 271, 274 (2) (501 SE2d 615) (1998).

stances which, as explained below, requires us to find an abuse of the trial court's discretion in terminating Coleman's parental rights. Consequently, we must reverse the instant decree of adoption as ordered by the Superior Court of Putnam County.

The record of the adoption proceedings shows that Coleman and Angie D. Treece[2] were co-habitating in 1995 when Treece became pregnant. Coleman and she continued to live together throughout the pregnancy, with Coleman aiding in the support of Treece. K. C. was born on November 24, 1995, and Coleman was the named father on K. C.'s birth certificate; Coleman and Treece were both 19 years old at the time of K. C.'s birth. They continued to live together for another 15 months, with Coleman aiding in the support of the child.

In February 1997, Coleman and Treece separated. Treece took K. C. and, during the month of February, moved to Cartersville, Georgia. That same month, Treece met appellee Grimes and began living with him. The couple then moved to Duluth with K. C. They remained in Duluth for ten months. Coleman continued to have contact with K. C. and Treece during the Duluth residency; as stated by Treece, "From the time we split up, we had contact until after I moved from Duluth." Coleman attempted to provide support for K. C. during this period, as well.

In February 1998, Grimes and Treece moved with K. C. to Marietta, Georgia: "And he [Coleman] knew we were there. He had contact [sic] us." Five months later, Grimes and Treece moved with K. C. to Mississippi. Treece did not tell Coleman that they were moving to Mississippi. From the following bit of circular reasoning contained in the record, it seems clear that Treece believed the responsibility of keeping in contact with K. C. during Treece's continuous residence changing belonged to Coleman, alone:

> [Defense Counsel:] [Did you notify Coleman] that you were taking [K. C.] out of the State of Georgia?
> [Treece:] No.
> [Defense Counsel:] And why didn't you do that?
> [Treece:] Because I didn't have a number for him.
> [Defense Counsel:] Did you try to find a number for him?
> [Treece:] No, I did not.
> [Defense Counsel:] Why didn't you do that?
> [Treece:] Because he didn't want to contact — he didn't stay in contact with me.
> [Defense Counsel:] How can he stay in contact with you if he

---

[2] Although Treece ultimately married appellee Grimes, we will refer to her as "Treece" throughout this opinion for clarity's sake.

doesn't even know what state you're living in.

[Treece:] Oh, he did.

[Defense Counsel:] You just testified that he didn't know you were in Mississippi.

[Treece:] Because I didn't tell him. Well, there was another party that informed him of where we were.

[Defense Counsel:] And you don't think that it is your responsibility to tell the father of your child where you are at?

[Treece:] If I don't have a way to contact him.

Coleman lost contact with K. C. when she was moved to Mississippi. Three months later, in November 1998, Grimes and Treece moved with K. C. to Acworth, Georgia. At that point, K. C. had been moved five times in the twenty months since Coleman and Treece separated. Again, Treece did not tell Coleman that she had moved K. C., this time back to Georgia. Coleman testified that he found out about K. C.'s return to Georgia in April 1999, while Treece testified that Coleman found out about K. C.'s return in December 1998. Whichever date is correct, however, it is undisputed that Coleman learned of his child's whereabouts only because he made the effort to track her down. As Treece testified, "he showed up on our door [in Acworth] and he informed me that he had gone to my father's house and asked them where we were and, basically, my father pointed him in the direction and he knocked at our door." Coleman testified that "[e]very time I found where she [K. C.] was, I would call and ask to see my daughter and offer child support." In addition, Coleman was registered with the Department of Human Resources' putative father registry.

Coleman further testified that, after he located K. C. in Acworth, "I would call at least every weekend and ask to see my daughter and to give her cash or whatever. She [Treece] would not accept because then she would feel that would give me the right to see my daughter." Treece, on the other hand, testified that she never received any cash from Coleman and that she did not try to prevent him from seeing K. C.

On May 5, 1999, Coleman attempted to visit K. C. at the Acworth residence and give Treece $50 toward support. Coleman testified that Treece refused to permit him to visit K. C. and refused the child support payment. During this May meeting, Treece also informed Coleman that she and Grimes would be moving with K. C. to Eatonton, Georgia, some time in the future; "I just said Eatonton." "I said, 'If you want to find out where we're moving, you need to call us before we move.'"

At that point, Coleman had already retained an attorney, and,

on May 27, 1999, a petition to legitimate K. C., *Coleman v. Treece*, CV99-1187, was filed on Coleman's behalf in the Bartow County Superior Court, which was Coleman's county of residence. Coleman testified that "after she wouldn't let me see my daughter, and that's when I tried to — that's when I went for legitimation so it would be all legal, and she couldn't refuse the money." That same day, May 27, 1999, an "Acknowledgment of Service and Waiver of Hearing" was filed. The acknowledgment, signed by Treece, stated, "The undersigned Defendant on the above-styled case [*Coleman v. Treece*, CV99-1187] hereby acknowledges personal service of the Petition to Legitimate a Child, and I also waive all hearings in this action and all additional service of process is hereby waived." Treece's signature was notarized.

Two months later, in July 1999, Treece married appellee Grimes. In November 1999, they moved to Putnam County, where Grimes' "family has owned property in Eatonton hundreds of years." The next month, Coleman went to the empty Acworth residence with a Christmas gift for K. C.; apparently, this was how he learned that K. C. had been moved again.

Although Treece had told Coleman that they were moving "to Eatonton," her residence with K. C. was actually in rural Putnam County, not in the town of Eatonton. Further, although Grimes was in the telephone book, he was listed under the name "William T. Grimes," not "Tommy Grimes," the name by which Coleman knew him. Treece testified that in March 2000, four months after she moved, she telephoned Coleman and left a message on his answering machine with K. C.'s new address and telephone number. Coleman testified that Treece called him and left only a telephone number; "she gave a phone call, gave me a phone call, gave me her phone number and then I tried the Internet, but anyway, eventually I got her address." Coleman testified that prior to that time, he could not communicate with K. C. or offer support "[b]ecause I had no contact and did not know where they were — she was." Thereafter, he called Treece to work things out: "after she did call and left her phone number and I did find out where she was, anytime I would try to set anything up, she would disagree and we would have conversations over the phone."

At the end of July 2000, a petition for Grimes' adoption of K. C. was prepared. In conjunction, Treece prepared a "Mother's Affidavit" as required under the statute for stepparent adoption, OCGA § 19-8-6 (g). Therein, Treece swore under oath that Coleman "Has not provided for my support (including medical care) during my pregnancy or hospitalization for the birth of the child; and Has not made any attempt to legitimate the child."

On August 4, 2000, the petition for adoption and attached

mother's affidavit were filed; Coleman was noticed on August 11, 2000. Coleman attempted to call K. C. and send support money.

A hearing on the adoption petition had already been scheduled for October 17, 2000. Coleman's attorney filed a defense and answer to the petition on September 11, 2000. Thereafter, on September 21, 2000, Coleman's attorney filed a Notice of Pending Legitimation in Bartow County. On September 27, 2000, Grimes' attorney sent Coleman's attorney a letter requesting that Coleman cease any further attempts to pay child support or to telephone K. C.: "Please ask your client to refrain from any further contact with my clients or the child and let's see how the [adoption/termination] hearing goes."

For 16 months, since May 1999, Treece had not responded to Coleman's petition for legitimation. A final hearing thereon was set in Bartow County Superior Court for October 5, 2000. The parties were noticed on September 25, 2000. On October 3, 2000, Grimes' attorney requested and received by agreement of the parties a continuance of the legitimation hearing until October 12, 2000.

Thereafter, on October 4, 2000, Grimes' attorney prepared an answer to the legitimation petition and sought therein a further continuance "until after October 17, 2000 which is the date of the Final Hearing of the proceedings in Case Number 20000A6-08 of Putnam Superior Court in which proceedings the Defendant in this action is seeking the termination of Plaintiff's rights in this action to the minor child." While Grimes claims that such answer was filed, the copy in the record before us bears no filing stamp, and there is no evidence in the record that the answer was filed.

On October 10, 2000, Grimes' attorney filed a written motion to further continue the legitimation hearing because the October 17 adoption/termination hearing "would be dispositive, perhaps, of those issues" and because Grimes' attorney was "unable to drive up there [Bartow County] based on doctor's orders." No doctor's orders are made a part of the record in this case. The Superior Court of Bartow County denied the attorney's request for continuance "due to the fact that the Petition to legitimate was continued for over one (1) year and the Defendant [Treece] filed no answer and this case has been pending longer than the Adoption Petition." Apparently, the Bartow County Superior Court determined that, in the interest of fairness, Coleman's sixteen-month-old petition to legitimate K. C. and obtain the rights of a legal father should be addressed before Grimes' two-month-old petition to terminate his parental rights: "The Court is aware of the Petition to Terminate the Plaintiff's rights to the minor child filed in Putnam County Superior Court, but elects to proceed with the Legitimation Petition because of the Plaintiff's explicit rights to file such action as recognized in OCGA § 19-8-12 (e) and OCGA § 19-7-22."

On October 12, 2000, the Superior Court of Bartow County heard Coleman's petition to legitimate K. C. Grimes did not file a motion to intervene in the legitimation proceeding, and neither Grimes, Treece, nor counsel for same was present at the hearing. Thus, the Bartow County Superior Court heard uncontroverted testimony. No transcript of the hearing is before this Court. Thereafter, on October 12, 2000, the Bartow County Superior Court rendered an order, making the following findings of fact:

> that Coleman "lived with and cared for said minor child for two (2) years before the parties separated"; that Coleman "was paying support for the minor child and having visitation with the minor child on a regular basis until May, 1999"; that such regular support was disrupted due to the fact that, after May, 1999, Treece "left with the minor child without notifying the Plaintiff of her or the minor child's whereabouts"; that Coleman "has had a relationship with the minor child"; and that Coleman "is the biological father of the minor child and his petition to legitimate is hereby granted."

In its order, the court also ordered child support payments of $100 per week and visitation rights. No attempt to challenge the Bartow County ruling is in the record before us. Following the court's order, Coleman immediately attempted to comply with the child support terms and also sought visitation. The checks were returned, and Treece would not permit Coleman to see K. C.

Five days later, on October 17, 2000, the Superior Court of Putnam County heard Grimes' petition to terminate Coleman's parental rights and adopt K. C. Therein, Grimes, Treece, Coleman, and Coleman's girlfriend testified as reflected above. During the hearing, Grimes' counsel admitted that Treece had made a false statement on her "Mother's Affidavit," but claimed "[m]y client never knew that the pleadings had been filed." Nonetheless, the Putnam County Superior Court specifically found that Treece swore in the "Mother's Affidavit" Coleman "had not made any attempt to legitimate," when "She knew better than that. She had signed the consent to legitimation in May of 1999. She knew he had made some attempt to legitimate this child." Thereafter, however, the court determined that the affidavit was in "substantial compliance" with the requirements of OCGA § 19-8-26 (h), notwithstanding the false statements contained therein.

In addition, the Putnam County Superior Court was aware of the prior Bartow County order and legitimation, but the court deter-

mined that such prior ruling had no impact on the instant proceeding.

Subsequently, in a November 13, 2000 order dated nunc pro tunc to October 17, 2000, the court made the following findings of fact:

> that the child has been abandoned by the biological Father, Devin Patrick Coleman, pursuant to OCGA § 19-8-10 (1) (a) and additionally that the biological Father for a period of one year or longer immediately prior to the filing of the Petition for Adoption in this action, without justifiable cause, has significantly failed to communicate or make a bona fide attempt to communicate with the child in a meaningful, supportive, parental manner or to provide for the care and support of that child as required by law.

The Superior Court of Putnam County terminated Coleman's parental rights to K. C. and granted the petition for adoption. A motion for new trial was filed on Coleman's behalf, and a hearing was held thereon. During the course of the hearing, Grimes' attorney protested the fact that Coleman was still attempting to see K. C. "because he thinks he's got visitation rights somehow or other because he legitimated the child." In addition, Coleman's child support checks were refused and returned. The court denied the motion for new trial, and the order carried the stipulation that

> Devin Patrick Coleman Shall not attempt to exercise any visitation rights he may have during the pendency of this action and his failure to do so shall not be considered against him. Additionally any child support payments made by respondent for the benefit of the child shall be made to his attorney who shall hold the same in her trust account until further order of this court.

This appeal followed. *Held*:

1. Coleman contends that the doctrine of collateral estoppel bars the basis upon which his parental rights to K. C. were terminated. We agree.[3]

(a) The doctrine of collateral estoppel, also known as estoppel by judgment, is similar to res judicata, but not identical.

---

[3] We reject Grimes' contention that the issue of collateral estoppel is waived because it was not raised in Coleman's answer. *Hardy v. Ga. Baptist Health Care Systems*, 239 Ga. App. 596, 597 (521 SE2d 632) (1999). A review of the record shows that such issue was fairly raised and was before the court through responsive filings in opposition to the adoption, as well as the filing of the prior Bartow County pleadings and order thereon.

Generally, res judicata bars relitigation of any matter of a cause of action that was, or could have been, put in issue and adjudicated in a prior proceeding between the same parties, while estoppel by judgment prevents relitigation in a subsequent suit [—] involving a different cause of action [—] a matter which was actually adjudicated in a former case. Neither defense, however, is available unless the subsequent suit is between the same parties or their privies.[4]

"Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right."[5] And where this identity of interest is found to exist, "all are alike concluded and bound by the judgment."[6] While a husband and wife relationship alone does not create privity for purposes of collateral estoppel or res judicata,[7] in this case Treece was a party in the Bartow County proceeding where she was the named defendant with the legal right to contest Coleman's attempt to establish his status as K. C.'s "legal father." As Treece's husband and stepfather to K. C. with a petition pending to terminate Coleman's parental rights and establish his own status as K. C.'s "legal father," Grimes was in privity with Treece in the Bartow County action: Treece "represented her husband's interests, and [could have] asserted the same legal rights relative to those interests," in the Bartow County action.[8] Grimes and Treece had an identity of interest in the Bartow County judgment and would both be bound thereby in relation to K. C.; further, Grimes had a mutual legal right to contest the establishment of Coleman's parental rights in Bartow County,[9] and indeed, Grimes had the right to intervene in the legitimation proceeding for just such purpose.[10] In addition, Treece was in privity with Grimes in the Putnam County termination proceedings wherein her consent to Grimes' adoption of K. C. was essential; her affidavit purporting to outline Coleman's failure to exercise parental rights was required; and Grimes fully repre-

[4] (Citations and punctuation omitted.) *Miller v. Steelmaster Material Handling Corp.*, 223 Ga. App. 532, 535 (3) (478 SE2d 601) (1996).

[5] (Citations and punctuation omitted.) *Macuch v. Pettey*, 170 Ga. App. 467, 469 (2) (317 SE2d 262) (1984).

[6] (Citations and punctuation omitted.) *Pinkard v. Morris*, 215 Ga. App. 297, 298 (1) (450 SE2d 330) (1994).

[7] *Aycock v. Calk*, 228 Ga. App. 172, 175-176 (491 SE2d 383) (1997).

[8] *Waldroup v. Greene County Hosp. Auth.*, 265 Ga. 864, 866 (1) (463 SE2d 5) (1995).

[9] *Macuch v. Pettey*, supra at 469; *Miller v. Charles*, 211 Ga. App. 386, 387-388 (439 SE2d 88) (1993).

[10] OCGA § 9-11-24 (a) (2); *In re Ashmore*, 163 Ga. App. 194 (293 SE2d 457) (1982) (any interested party may file objection to legitimation petition). See also *Hardy v. Arcemont*, 213 Ga. App. 243, 246 (3) (444 SE2d 327) (1994).

sented her interests and purpose in seeking the termination of Coleman's parental rights to K. C.[11]

As such, both Grimes and Treece had a full opportunity in Bartow County to litigate whether Coleman abandoned his interest in K. C. through his conduct toward Treece, the child, or otherwise and, thus, prevent legitimation.[12] In Bartow County, Grimes and Treece could have litigated whether Coleman was "fit" to assume his parental rights using the same reasons they asserted in their Putnam County petition and affidavit as a basis for terminating those rights. Even their attorney recognized that the Bartow County proceeding "would be dispositive" of the same issues raised in Putnam County as a basis for terminating Coleman's parental rights. "The subject matter was identical in both actions. [Grimes and Treece] had a full opportunity in the first action to litigate each and every claim existing between the parties which touched on [the issue of Coleman's fitness to assume parental rights to K. C.] It was [their] duty to do so."[13]

However, this was not done. Instead, it appears that attempts to delay the Bartow County legitimation proceedings were made so that the same issues could be litigated in a different forum, perhaps anticipated to be more favorable to Grimes and Treece. In so doing, no objection to the legitimation appears of record, and the transcript of that prior hearing is not before us. Accordingly, we must assume that the judgment of legitimation in Bartow County was correct and authorized by the evidence.[14]

As such, the Superior Court of Bartow County determined that Coleman did not abandon K. C. and that he is a "fit" parent to have custody of the child.[15] As facts essential to the judgment, the Bartow County Superior Court specifically found that Coleman was financially supporting K. C. and had developed a relationship with her through visitation until such conduct was disrupted by the actions of Treece, who disappeared with K. C. without notifying Coleman of their whereabouts. Thus, because of Treece's actions, not Coleman's inactions, he did not know where K. C. was located in order to pursue visitation and financial support. There is nothing in the record demonstrating the Bartow County judgment was ever challenged. "A

---

[11] *Macuch v. Pettey*, supra at 469; *Miller v. Charles*, supra at 387-388.

[12] See *In re Baby Girl Eason*, 257 Ga. 292 (358 SE2d 459) (1987) (in legitimation, trial court must determine whether the father had abandoned his opportunity interest through his conduct with regard to the mother and the child and otherwise). See also *LaBrec v. Davis*, 243 Ga. App. 307 (534 SE2d 84) (2000).

[13] (Citations and punctuation omitted.) *Buford-Clairmont Co. v. Cato Corp.*, 241 Ga. App. 50, 54 (4) (526 SE2d 104) (1999).

[14] *Gregg v. Barnes*, 203 Ga. App. 549, 551 (417 SE2d 206) (1992).

[15] *Turner v. Wright*, 217 Ga. App. 368, 369-370 (457 SE2d 575) (1995).

judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside."[16] Consequently, Grimes and Treece are estopped from relitigating in the Putnam County proceeding to terminate Coleman's parental rights precisely the same issues previously determined in Bartow County when granting Coleman parental rights. Thus, the Putnam County Superior Court's factual findings that Coleman abandoned K. C. and unjustifiably failed to provide support or pursue visitation — findings in direct contradiction to the prior Bartow County Superior Court's findings underpinning its judgment — provide no basis for the termination of Coleman's parental rights. Reversal of the Putnam County judgment is required.

(b) Upon remand and retrial of the petition for adoption/termination of parental rights, the Superior Court of Putnam County should defer to the findings of fact made in Bartow County with regard to Coleman's conduct toward K. C. and his attempts to establish a familial bond. Clearly, there is no evidence of abandonment under OCGA § 19-8-10 (a), because, even from the evidence adduced in Putnam County, there is no evidence whatsoever of "an actual desertion, accompanied by an intention to sever entirely, as far as possible to do so, the parental obligations and forego all parental duties and claims."[17] Further, considering the number of times K. C. has been moved from residence to residence, Treece's admitted failure to timely communicate the location of each new residence, her false statements in the "Mother's Affidavit," the Bartow County Superior Court's determination that it was the actions of Treece that disrupted the familial bond between Coleman and K. C., and Coleman's repeated attempts to comply with his rights as a legal father as soon as such rights were established, it is unlikely Grimes could show under the "clear and convincing" standard required to support a termination of parental rights that Coleman's conduct met one of the two alternative grounds for terminating his rights under OCGA § 19-8-10 (b): failure for at least one year, *without justifiable cause*, to communicate meaningfully with or provide support for the child.[18]

2. Coleman contends the trial court erred in denying his motion for new trial based on the fact that the "Mother's Affidavit" filed by

---

[16] OCGA § 9-12-40.

[17] (Citations and punctuation omitted.) *Spires v. Tarleton*, 225 Ga. App. 117, 119 (2) (483 SE2d 337) (1997).

[18] Id. at 119. See also *Clark v. Wade*, 273 Ga. 587 (544 SE2d 99) (2001) (termination of parental rights requires "clear and convincing" standard of proof).

Treece contained false statements. We agree.

OCGA § 19-8-6 (g) states that "Whenever the legal mother . . . consents to the adoption of her child by her spouse pursuant to this Code section, she shall execute an affidavit meeting the requirements of subsection (h) of Code Section 19-8-26." Subsection (h) (1) (G) of OCGA § 19-8-26 states, inter alia, that the affidavit of a legal mother "shall set forth: . . . Whether or not the biological father of the child has lived with the child, contributed to its support, provided for the mother's support or medical care during her pregnancy or during her hospitalization for the birth of the child, or made an attempt to legitimate the child." The sworn information required in the "Mother's Affidavit" supplies factors for the court to consider in making a determination as to whether the father has abandoned the child or instead has established a familial bond with the child.[19] "The purpose of the mother's affidavit, as stated on the form itself, is to gather information to be used by the [court] in notifying and determining the rights of the father. It does not purport to protect or otherwise affect the rights of the mother."[20] Moreover, the requirements of the adoption statute *are mandatory* and "should be strictly construed and meticulously followed so that beyond all peradventure the adoption will not later be subject to attack."[21] Such statutes governing the surrender of parental rights and adoption must be strictly construed in favor of the biological parent whose rights are at issue:[22] "Adoption laws are to be strictly construed in favor of natural parents, for the application thereof results in the severance forever of the paternal relation."[23]

Here, in the "Mother's Affidavit," the record shows that Treece swore falsely both that Coleman had not provided support during her pregnancy and that Coleman had made no attempt to legitimate K. C. These false statements were directly related to the issues of abandonment and the establishment of a parental bond, both material elements in a petition to terminate parental rights. And the Putnam County Superior Court specifically determined that Treece "knew better" at the time she made the false statements. While the trial court correctly noted that an affidavit which is in "substantial compliance" with the form outlined in OCGA § 19-8-26 (h) is permissible, the *form* of the affidavit is not what is at issue here. In this

---

[19] *Cowdell v. Doe*, 225 Ga. App. 97, 99 (483 SE2d 347) (1997).

[20] (Citation and punctuation omitted.) *Mabou v. Eller*, 232 Ga. App. 635, 638 (2) (c) (502 SE2d 760) (1998).

[21] (Citations and punctuation omitted.) *In re Stroh*, 240 Ga. App. 835, 840 (1) (b) (i) (523 SE2d 887) (1999).

[22] *In the Interest of A. N. M.*, 238 Ga. App. 21, 24-25 (517 SE2d 548) (1999).

[23] (Citation and punctuation omitted.) *Jones v. Sauls*, 213 Ga. App. 55, 58 (3) (c) (443 SE2d 693) (1994).

case, the *substance* of the affidavit is knowingly false.[24]

Strictly construing the statute in favor of Coleman, as we must, we cannot say that the "Mother's Affidavit" containing *knowingly* false statements purporting to address the material issues of Coleman's lack of parental involvement "substantially complies" with the requirements of OCGA §§ 19-8-6 (g) and 19-8-26 (h) so as to sustain a judgment terminating Coleman's parental rights based thereon.[25]

3. Grimes moves to dismiss the instant appeal as untimely filed because the order denying Coleman's motion for new trial was filed on February 26, 2001, while the notice of appeal therefrom was dated January 29, 2001. This contention is meritless. Despite its filing date, the order from which Coleman appeals was dated nunc pro tunc to January 9, 2001, the date on which the trial court first denied the motion for new trial following a hearing thereon. This is a proper use of a nunc pro tunc filing, which is "an entry made now of something actually previously done to have effect of former date."[26] Dating the order denying the motion for new trial "nunc pro tunc" gave the order "retroactive effect [to January 9, 2001], i.e., with the same effect as if regularly done."[27] Thus, Coleman's notice of appeal, dated January 29, 2001, fell within the statutory period for timely filing from the denial of his motion for new trial pursuant to OCGA § 5-6-38 (a). And Grimes' motion to dismiss is denied.

*Judgment reversed and case remanded. Andrews, P. J., and Miller, J., concur.*

DECIDED JULY 31, 2001 — 

*Josie L. Redwine*, for appellant.
*Donald W. Huskins*, for appellee.

---

[24] Compare *Families First v. Gooden*, 211 Ga. App. 272, 274-275 (2) (439 SE2d 34) (1993) (knowingly false statements in mother's affidavit do not require reversal when *mother* attempts to reverse adoption based thereon, and "it would [be] inequitable to allow the . . . mother to profit by her own intentional misconduct." *Spires v. Tarleton*, supra at 118 (1)).

[25] *Spires v. Tarleton*, supra.

[26] (Citations omitted.) *Andrew L. Parks, Inc. v. SunTrust Bank*, 248 Ga. App. 846, 848 (545 SE2d 31) (2001).

[27] (Citation and punctuation omitted.) *Mullins v. State*, 224 Ga. App. 218, 219 (1) (480 SE2d 264) (1997) (Beasley, J., concurring specially).