A95A1131, A95A1132. GHRIST v. FRICKS et al.; and vice versa.
(465 SE2d 501)

JOHNSON, Judge.

Gina Fricks, formerly Gina Ghrist ("Ms. Fricks"), and William Ghrist ("Ghrist") were married June 20, 1987. When Ms. Fricks gave birth to Matthew Ghrist on December 21, 1988, Ghrist assumed he was the child's father and had no reason to believe or even suspect that such was not the case. He was listed as the father on the birth certificate and he lived with Ms. Fricks and the child until the couple separated in August 1990. Unbeknownst to Ghrist, Ms. Fricks had been having sexual intercourse with Thomas Fricks ("Mr. Fricks") on at least a weekly basis beginning a few months into their marriage and continuing through and after the period when the child was conceived. Ms. Fricks suspected Mr. Fricks was the father shortly after discovering she was pregnant, and within a few days she notified Mr. Fricks of her pregnancy and of the possibility that he rather than her husband was the father of the child. According to the testimony of Mr. Fricks at trial, the Fricks, having discussed the possibility that Fricks fathered the child, could have had paternity testing done at that time but did not see any reason to do so. Mr. Fricks and Ms. Fricks continued to actively conceal their relationship from Ghrist, who did not find out that the two were involved until after Ms. Fricks

moved from the marital residence. When Ms. Fricks filed for divorce in September 1990, she alleged in her complaint that Ghrist was the child's father. Ms. Fricks and Ghrist executed a settlement agreement on October 23, 1990, wherein they refer to their minor child and set out Ghrist's visitation rights and support responsibilities. Prior to their execution of this divorce settlement agreement, Ms. Fricks gave Ghrist positive assurance that the child was his child. On November 27, 1990, the court entered a final judgment and decree of divorce ending the marriage of Ghrist and Ms. Fricks. In this judgment, the court approved the settlement agreement and expressly incorporated it into its order. Some three months later, in February 1991, Mr. and Ms. Fricks were married. Eight months after their marriage, in October 1991, the Fricks and Matthew had blood tests performed for the purpose of confirming that Mr. Fricks was the child's biological father. The results of these tests showed a 99.14 percent probability that Mr. Fricks was the father. After another five months had elapsed, in March 1992, the Fricks filed what they labelled "a petition to terminate parental rights" in the Superior Court of Fulton County. In the petition, which in substance was actually a petition to determine paternity, they alleged that Mr. Fricks is Matthew's natural father and that because the child lives with his natural parents, Ghrist should be relieved of his child support obligation and his parental rights. The petition was subsequently amended to include a prayer that the child be legitimized as Mr. Fricks' son. Upon the Fricks' motion and over Ghrist's objection, the trial court ordered Ghrist to submit to a paternity test; this blood test excluded any possibility that Ghrist was the biological father of the child.

In this paternity action, the trial court granted summary judgment against Ms. Fricks, holding that she was barred from disputing paternity based on the doctrine of res judicata. Ms. Fricks did not appeal that ruling. A jury heard evidence on the issue of paternity and decided that Mr. Fricks was the father. The jury also awarded Ghrist damages on his counterclaim against Ms. Fricks for fraud and punitive damages, a claim which the record makes clear Ghrist pursued only as an alternative should he lose in the paternity action. The trial judge then entered a judgment upon the jury's verdict declaring Mr. Fricks to be Matthew's legal and biological father, relieving Ghrist of his obligation to pay support and divesting him of any parental rights. The court also entered judgment against Ms. Fricks for fraud and ordered her to pay punitive damages. In Case No. A95A1131, Ghrist appeals. The Fricks appeal in Case No. A95A1132.

### Case No. A95A1132

1. Ghrist contends that the trial court erred in ordering him to

take a blood test to exclude him as the father because the "de-legiti-mation" of a child born during wedlock and previously adjudicated to be the husband's child is contrary to law, public policy and the best interest of the child. For the reasons set out below, we agree and re-verse.

"Collateral estoppel precludes readjudication of an issue previ-ously adjudicated between the parties or their privies in another ac-tion." (Citations omitted.) *Dept. of Human Resources v. Fleeman*, 263 Ga. 756, 757 (2) (439 SE2d 474) (1994). Ms. Fricks is clearly es-topped from challenging paternity. In her complaint for divorce, she alleged that the child was born as issue of the marriage. The settle-ment agreement which she signed, and which was approved by the court and incorporated into the divorce decree, referred to the child as being of the marriage in setting forth the rights and responsibilities of the parties. "Parties to stipulations and agreements entered into in the course of judicial proceedings are estopped from taking positions inconsistent therewith, and no litigant will be heard to complain un-less it be made plainly to appear that the consent of the complaining party was obtained by fraud or mistake." (Citations and punctuation omitted.) *Macuch v. Pettey*, 170 Ga. App. 467, 468 (1) (317 SE2d 262) (1984). Ms. Fricks has not alleged that her consent to the agreement was obtained by fraud or mistake. Indeed, we note that the record in this case shows that Mr. and Ms. Fricks had every reason to know that Mr. Fricks was the child's father from the time she discovered she was pregnant, well before the separation and divorce, which be-came final some two-and-a-half years later. Despite their admissions that they actively concealed their adulterous relationship and their suspicions that Mr. Fricks was the father, they simply chose not to take any steps to conclusively resolve the issue until nearly three years after the child was born and nearly a year after the divorce was final. Mr. Fricks acknowledged at trial that there were opportunities during the marriage for the paternity testing to be pursued had he and Ms. Fricks desired to do so.

The issue of the paternity of the child was effectively adjudicated in the divorce action, and it could not later be raised by anyone bound by the prior action. Ms. Fricks was therefore estopped from disputing the child's paternity, and the trial court so ruled correctly.

Mr. Frick's situation is somewhat different inasmuch as he was not a party to the divorce proceeding. However, collateral estoppel applies not only to the parties, but also to their privies. *Pinkard v. Morris*, 215 Ga. App. 297, 298 (1) (450 SE2d 330) (1994). "Generally speaking, privies are those legally represented at trial. Privity con-notes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right; and where this identity is found to

exist, all are alike concluded and bound by the judgment." (Citations and punctuation omitted; emphasis supplied.) Id. "[I]t is an elementary principle of law that a privy, either in law, fact, or estate, has no greater right than the one with whom he is in privity." *Phillips v. Phillips*, 211 Ga. 305, 309 (1) (85 SE2d 427) (1955). Mr. Fricks was involved in a meretricious adulterous relationship with Ms. Fricks throughout her marriage to and separation from Ghrist. He conspired with her to engage in adulterous acts and conceal from Ghrist both the adultery and the possibility that Mr. Fricks fathered the child. Mr. Fricks then sat silently by as Ms. Fricks represented to the superior court that the child was Ghrist's and that Ghrist was obligated to support him, and acquiesced as Ms. Fricks accepted support payments for more than a year thereafter, during which time he lived with Ms. Fricks. Mr. Fricks certainly had an interest in Ms. Fricks becoming divorced, as evidenced by his marriage to her within three months after the divorce became final. From these facts, we conclude that Mr. Fricks was so connected in law and in fact with Ms. Fricks as the plaintiff in the divorce action, that he is likewise bound by the judgment and has no greater right to contest paternity than she does. Id.; see generally *Dept. of Human Resources v. Hurst*, 208 Ga. App. 792 (432 SE2d 236) (1993).

The public policy of this state favoring the institution of marriage and the legitimacy of children born during a marriage is the strongest public policy recognized by law. This Court's holding in *Hardy v. Arcemont*, 213 Ga. App. 243, 245 (1) (444 SE2d 327) (1994), that "(a)ll children born in wedlock or within the usual period of gestation thereafter are legitimate, but the legitimacy of such a child may be disputed; where possibility of access exists, the strong presumption is in favor of legitimacy and the proof must be clear to establish the contrary," citing OCGA § 19-7-20 (a) and (b), is but one of the latest of a long series of decisions rendered by the appellate courts of Georgia recognizing this public policy and evincing the commitment of Georgia's courts to enforcing it. "This presumption of legitimacy is one of the strongest and most persuasive known to our law." *Stephens v. State*, 80 Ga. App. 823, 825 (57 SE2d 493) (1950). Moreover, "[t]his statutory presumption is a *firmly-established* principle of law, evincing a strong state policy favoring marriage and legitimacy." (Emphasis supplied.) *Miller v. Miller*, 258 Ga. 168, 169 (366 SE2d 682) (1988).

Given the facts of this case, the public policy favoring marriage and legitimacy particularly militates against the Fricks' right to, in effect, render the legitimate child illegitimate. For nearly three years after the birth of the child, Ghrist, as Ms. Fricks' husband, was bound by law to support the child and in fact did so. Ghrist was present in the delivery room at the child's birth, and lived with him as his father

for nearly two years while the couple was still married. When the couple separated, Ghrist kept the child two weeks out of every month. From January 1991 through the time of the trial, Ghrist had custody every other weekend and five to six weeks every summer. Ms. Fricks admitted that Ghrist exercised all scheduled visitation rights and that he always made his child support payments. Ghrist took the child camping and sailing, taught him to play tennis, and helped teach him to read. According to Ghrist, he and the child relate to each other as father and son and enjoy a happy, loving relationship. This testimony was corroborated by Ms. Fricks' own father, who testified that Ghrist and the child get along "like father and son, pals, friends," and added that "at the same time, [Ghrist] does maintain discipline . . . the way a father should." When Ms. Fricks offered to let him stop making support payments if he would end his relationship with the child, Ghrist refused. Ghrist testified that he still believes he is the child's father and that he could not imagine life without him.

This Court cannot in good conscience permit the Fricks to now deny that Ghrist is the child's father and to sever all ties the child has with his legal father. We do not believe that the law allowing the presumption of legitimacy to be rebutted was ever intended to sanction the result sought by the Fricks. In fact, it is clear from our examination of the legitimation and paternity statutes that the primary purpose of these statutes is to provide for the establishment rather than the disestablishment of legitimacy and paternity. See OCGA §§ 19-7-20 through 19-7-49. For instance, while the legislature enacted a statute allowing a father to petition to legitimate a child, it enacted no statute specifically providing for the de-legitimation of a child. See OCGA § 19-7-22. And while OCGA § 19-7-43 provides a means for establishing paternity, no such statute provides for the disestablishment of paternity. That these statutes should be used to establish legitimacy and paternity is appropriate; it is certainly not in the legitimate child's best interest to be rendered illegitimate. See Judge Beasley's dissent in *Noggle v. Arnold*, 177 Ga. App. 119, 120-123 (338 SE2d 763) (1985). Moreover, public policy will not permit a mother and an alleged father to enlist the aid of the courts to disturb the emotional ties existing between a child and his legal father after sitting on their rights for the first three years of the child's life.

Obviously, we realize that presumed legitimacy may be challenged. See *Hardy*, supra. However, we have found no cases in which the appellate courts of this state have allowed an alleged biological father to challenge the presumed legitimacy of a child under facts similar to those presented here. For example, in *Hardy*, supra, this Court recognized the right of an alleged biological father to file a legitimation action although the child was conceived while the mother was married to another man and the husband's name was on the birth

certificate. In that case, however, unlike in this one, the husband and wife had agreed in the prior divorce action that no children were born of the marriage. In *In re White*, 254 Ga. 678 (1) (333 SE2d 588) (1985), the Supreme Court held that a mother could testify as to the illegitimacy of her presumptively legitimate child in a legitimation proceeding brought by the biological father where the legal father's whereabouts were unknown. There the court noted that the legal father had never known or supported the child and had not been heard from in several years. The Supreme Court also held that a man claiming to be the biological father of a presumptively legitimate child was entitled to appear and present proof of paternity in a termination of parental rights proceeding brought by the Department of Human Resources against both him and the legal father based on abandonment by the men and the death of the mother. *Wilkins v. Dept. of Human Resources*, 255 Ga. 230, 233-235 (2) (a), (b) (337 SE2d 20) (1985). The case was a termination case brought in juvenile court and the Supreme Court's decision was based upon OCGA § 15-11-52 (b), which section was repealed in 1986. As discussed in Division 2 below, the instant case was not, despite its denomination as such, a termination of parental rights case. Moreover, the circumstances presented and interests sought to be protected are clearly different in this case.

Finally, we acknowledge the holding in *Hill v. Adams*, 182 Ga. App. 848 (357 SE2d 300) (1987), where an alleged biological father of a child who had already been adjudicated to be the child of the mother's husband in a divorce action was authorized to petition to legitimate the child after establishing paternity. We do not know from the published opinion what involvement the alleged biological father had in the mother's life during or soon after her marriage; thus, it is difficult for us to compare the cases factually. Moreover, because one panel judge concurred in the judgment only, the case serves as physical precedent only, which we are not bound to follow. See Court of Appeals Rule 33 (a).

Paternity and legitimation are not the same thing. *Hill*, supra. Biology is not destiny, and a man has no absolute right to the grant of his petition to legitimate a child simply because he is the biological father. See *Mabry v. Tadlock*, 157 Ga. App. 257, 259 (277 SE2d 688) (1981). Instead, we have held time and time again that the court *must* consider the best interest and welfare of the child before granting a legitimation petition, and that it is not bound by the desires and contentions of the biological parents. See *Alexander v. Guthrie*, 216 Ga. App. 460, 461-462 (1) (454 SE2d 805) (1995); *Boyd v. Harvey*, 173 Ga. App. 581, 584 (2) (327 SE2d 551) (1985). Here, however, once the jury determined that Mr. Fricks was the biological father, the trial court automatically granted the legitimation, apparently disregarding its duty to inquire further into the best interests of the child and the

effect such a decision would have upon the child. This the trial court is not authorized by law to do.

We point out that the superior court judge in this case was confronted with a terribly difficult situation in which all parties had compelling, diametrically opposed interests. The facts of this case are unusual and, unfortunately, the trial court had scant relevant precedent upon which to rely in making its decision. However, considering the principles of collateral estoppel, the statutory presumption of legitimacy, the strong public policy favoring the institution of marriage and the legitimacy of children born during marriage, and the particular facts of this case, we hold that the trial court erred in not dismissing Mr. Fricks' petition. To hold otherwise would be to sanction the fraud Ms. Fricks and Mr. Fricks perpetrated not only upon Ghrist, but upon the court hearing the divorce. If Mr. Fricks and Ms. Fricks suffer heartache and inconvenience, among the reasons they cited at trial for pursuing this action, it results from their own fraudulent misconduct. Accordingly, the trial court's judgment granting the petition to determine paternity and to legitimate must be reversed, and the case is hereby remanded with direction that the action be dismissed and the parental rights and responsibilities of Ghrist be immediately reinstated.

2. While we agree with Ghrist's claim that the superior court lacked jurisdiction to terminate his parental rights, that issue is not only rendered moot by our holding in Division 1, but for reasons set out below is otherwise without merit. We note that except in connection with adoption proceedings, exclusive jurisdiction to terminate parental rights lies with the juvenile court. OCGA § 15-11-5 (a) (2) (C). *Alexander*, supra at 462 (2). However, we do not agree with Ghrist's characterization of the case as a termination of parental rights action. "[T]here is no magic in the nomenclature of a pleading; it is construed to serve the best interests of justice and judged by its substance rather than by its name." (Citations and punctuation omitted.) *Dyer v. Surratt*, 216 Ga. App. 876 (456 SE2d 510) (1995). Despite the title given the petition, it appears to be a complaint to determine paternity and to legitimate the child. From a practical standpoint, the superior court should have jurisdiction inasmuch as the issue of Ghrist's rights regarding the child is ancillary to the paternity and legitimation issues, over which the superior court does have jurisdiction. See OCGA §§ 19-7-22; 19-7-40.

3. Based on our holding in Division 1, we need not address Ghrist's remaining enumerations of error.

*Case No. A95A1132*

4. In her cross-appeal, Ms. Fricks challenges the judgment en-

tered against her on Ghrist's counterclaim, claiming: (a) the trial court erred in refusing to instruct the jury on the defense of estoppel when Ghrist continued to pay child support after being told Mr. Fricks fathered the child and after being offered an agreement which would end his support obligation; and (b) the verdict against her for fraud was against the weight of the evidence and contrary to the evidence and justice. Ms. Fricks' challenge regarding the estoppel instruction is without merit because the evidence adduced at trial did not authorize such a charge. See *Gainesville Glass Co. v. Don Hammond, Inc.*, 157 Ga. App. 640, 644-645 (2) (278 SE2d 182) (1981). And contrary to Ms. Fricks' contention, the verdict against her was supported by ample evidence. See generally *Hill v. Rodriguez*, 208 Ga. App. 108, 110 (2) (429 SE2d 682) (1993).

In any event, it is clear from the pleadings below and on appeal that Ghrist's primary objective has been to remain Matthew's legal father. He only sought damages on the counterclaim in the alternative, i.e., in the event the Fricks prevailed on their cause of action. Based on our holding in the main appeal that Ghrist will remain the child's legal father, the judgment entered on Ghrist's counterclaim must be vacated. On remand, the trial court is directed to vacate that judgment and to dismiss Ghrist's counterclaim. Accordingly, the cross-appeal is rendered moot.

*Judgment in Case No. A95A1131 reversed. Judgment in Case No. A95A1132 vacated. Birdsong, P. J., and Smith, J., concur.*

DECIDED DECEMBER 1, 1995 —
RECONSIDERATION DENIED DECEMBER 11, 1995 —

*Martin L. Fierman*, for appellant.
*S. Robert Hahn, Jr.*, for appellees.