**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0468. IN RE ESTATE OF JAMES ANDREW HAWKINS.

BRANCH, Judge.

After James Hawkins died unmarried and intestate in 2012, his girlfriend, Yuvette Ridley, filed a petition for letters of administration naming her as the estate's administrator and listing her son Makaleb, whom Hawkins had never adopted, as Hawkins's only heir at law. The probate court granted the petition and named Ridley as the estate's administrator and Makaleb as Hawkins's sole heir. Hawkins's sister, Patricia Hutchins, then moved to set aside this judgment. Following a hearing, the probate court held that Hawkins was not the child's biological father and that the child was not Hawkins's heir at law. The court also removed Ridley as the estate's administrator and appointed Hutchins in her stead. On appeal from this judgment, Ridley argues that when Hawkins executed a paternity acknowledgment and obtained

the listing of his name as the father on the child's birth certificate, he complied with the provisions of OCGA § 53-2-3 and made Makaleb his heir at law. We disagree and therefore affirm.

"Where a probate court sits as a finder of fact, we accept its findings if they are supported by any evidence. The probate court's application of the law is subject to de novo appellate review, however." *In re Estate of Price*, 324 Ga. App. 681 (751 SE2d 487) (2013) (citations omitted).

So viewed, the record shows that shortly after Ridley became pregnant by another man, she told Hawkins, her boyfriend, that he was not the biological father of the child. Hawkins himself never believed that he was the child's biological father. Hawkins continued his relationship with Ridley nonetheless, purchasing maternity clothes and paying for her doctor's visits. Hawkins was present at the birth of the child. On the day after the birth, the couple went to a State Vital Records Office and completed a State of Georgia Paternity Acknowledgment form. As to paternity, the form stated that "[t]his Acknowledgment attests that James Andrew Hawkins is the natural father of the child born on the 25th day of June 2007," and that Ridley and Hawkins were "requesting to have the name of the natural father entered on the birth certificate and the child be named Makaleb James Andrew Hawkins." Both Ridley and

2

Hawkins signed this portion of the form.[1] The second portion of the form, which contains two more signature spaces, specified that "by signing below, [Ridley and Hawkins] voluntarily consent and agree that the relationship between the named child and father shall be considered legitimate for all purposes under the law pursuant to

---

[1] At the time the paternity acknowledgment before us was executed, OCGA § 19-7-46.1 provided in relevant part:

> (b) When both the mother and father have signed a voluntary acknowledgment of paternity and the acknowledgment is recorded in the putative father registry established by subsection (d) of Code Section 19-11-9, the acknowledgment shall constitute a legal determination of paternity, subject to the right of any signatory to rescind the acknowledgment prior to the date of the support order, any other order adjudicating paternity, or 60 days from the signing of the agreement, whichever is earlier. Recording such information in the putative father registry shall constitute a legal determination of paternity for purposes of establishing a future order for support, visitation privileges, and other matters under Code Section 19-7-51.

In 2008, OCGA § 19-7-46.1 (b) was amended to add that "[a]cknowledgment of paternity shall not constitute a legal determination of legitimation pursuant to Code Section 19-7-21.1 or 19-7-22." Ga. L. 2008, Act 580, § 6.

3

OCGA § 19-7-22 (g) (2)."[2] Both Ridley and Hawkins also signed this portion of the form, which stated at its conclusion that "this affidavit must be signed by the mother and the person to be identified as the father in the presence of a witness as set forth in OCGA § 31-10-9 [e] (2)."[3]

---

[2] OCGA § 19-7-22 (g) (2) provides: "In any voluntary acknowledgment of paternity which has been made and has not been rescinded pursuant to Code Section 19-7-46.1, when both the mother and father freely agree and consent, the child may be legitimated by the inclusion of a statement indicating a voluntary acknowledgment of legitimation." OCGA § 19-7-21.1 (b), which became effective on July 1, 2008, provides:

Prior to [a] child's first birthday, a father of a child born out of wedlock may render his relationship with the child legitimate when both the mother and father have freely agreed, consented, and signed a voluntary acknowledgment of paternity and an acknowledgment of legitimation which have been made and have not been rescinded pursuant to Code Section 19-7-46.1. The State Office of Vital Records shall provide notice, in writing, of the alternatives to, legal consequences of, and the rights and responsibilities of signing a voluntary acknowledgment of legitimation.

[3] OCGA § 31-10-9 (e) provides in relevant part that "[t]he name of the natural father or putative father shall be entered on the certificate of live birth," on condition that "(2) If the mother is not married at either the time of conception or at the time of birth, the name of the putative father shall not be entered on the certificate of birth without the written consent of the mother and the person to be named as father[.]"

4

Eloise DeLaine, a worker at the records office, signed the paternity acknowledgement form as a witness. DeLaine's name also appears on the child's birth certificate, which bears the names of Ridley as mother and Hawkins as father. A few days after the child's birth, Hawkins took a paternity test, which confirmed that he was not the child's biological father. Nevertheless, Hawkins held Makaleb out as his son, and he named the child as a dependent on his applications for Veterans Administration and Social Security benefits.

After Hawkins died intestate on April 11, 2012, Ridley filed a petition in DeKalb County Probate Court for letters of administration naming Makaleb as Hawkins's only heir. On May 22, 2012, the probate court issued letters of administration to Ridley. On June 1, 2012, Hawkins's sister, Patricia Hutchins, filed the instant verified petition to determine heirs and a motion to set aside the probate court's judgment and to replace Ridley as the estate's adminstrator.[4]

At the evidentiary hearing on Hutchins's petition held on July 23, 2012, Ridley introduced the paternity acknowledgment into evidence. Hutchins objected to Ridley's characterization of the acknowledgment as an "affidavit," arguing that it did not

---

[4] Hutchins had also petitioned the probate court to become the conservator for Ella Hawkins, the incapacitated mother of both Hutchins and Hawkins.

amount to a "sworn statement attesting to the parent-child relationship" as required by OCGA § 53-2-3 (2) (A) (iii), the statutory provision governing the rights of inheritance through the father by children born out of wedlock. Hutchins introduced into evidence her petition for guardianship and conservatorship of her mother as well as Hawkins's paternity test results.

After the hearing, the trial court entered an order concluding that the paternity acknowledgment did not succeed in rendering Makaleb Hawkins's heir at law. The trial court held that although Ridley and Hawkins had executed a paternity acknowledgment, "this method for legitimating a child does not apply in the present case." The trial court concluded that Hawkins "was not the biological father" of Makaleb, that Makaleb "is not an heir at law of" Hawkins, and that "no method" of "establishing a right of inheritance for a child born out of wedlock" as provided in OCGA § 53-2-3 "applies in this case." The court also designated Ella Hawkins as the decedent's "sole heir at law," removed Ridley as administrator on the ground that she had "signed [the] paternity acknowledgment with the knowledge that the decedent was not the biological father" of the child, and appointed Hutchins in Ridley's stead. Ridley then moved for reconsideration, proffering an affidavit from DeLaine attesting that she worked as a medical records analyst at the hospital where the birth took place,

6

that she had "signed and witnessed" the paternity acknowledgment, and that she had certified Makaleb's birth certificate. The trial court denied the motion for reconsideration.

On appeal, Ridley argues that the trial court erred when it concluded that Makaleb is not Hawkins's heir at law because Hawkins "signed a sworn statement attesting to [his] parent-child relationship with Makaleb" and "effectively" signed the child's birth certificate. We disagree.

OCGA § 53-2-3 provides in relevant part:

(2) (A) *A child born out of wedlock may not inherit from or through the child's father*, the other children of the father, or any paternal kin by reason of the paternal kinship, *unless*: (i) [a] court of competent jurisdiction has entered an order declaring the child to be legitimate, under the authority of Code Section 19-7-22 or such other authority as may be provided by law; (ii) [a] court of competent jurisdiction has otherwise entered a court order establishing paternity; (iii) *[t]he father has executed a sworn statement signed by him attesting to the parent-child relationship*; (iv) *[t]he father has signed the birth certificate of the child*; *or* (v) [t]here is other clear and convincing evidence that the child is the child of the father.

(Emphasis supplied.)

Ridley has not asserted, either below or on appeal, that the execution of that portion of the paternity acknowledgment purporting to legitimate the child succeeds in doing so such that the requirements laid out in OCGA § 53-2-3 do not apply. Under our responsibility to read this and other statutes "not in isolation, but in the context of the other statutory provisions of which it is a part," *Abdel-Samed v. Dailey*, 294 Ga. 758, 763 (2) (755 SE2d 805) (2014) (citation omitted), we also note that neither OCGA § 19-7-22 (g) (2) nor OCGA § 19-7-46.1 specifies that a voluntary acknowledgment of paternity and/or legitimation renders the requirements of OCGA § 53-2-3 inapplicable as a matter of law. As there were no court proceedings begun before Hawkins's death either to legitimate Makaleb or otherwise to establish paternity under subsections (2) (A) (i) and (ii), the only questions remaining are thus whether the paternity acknowledgment amounted to "a sworn statement signed by" Hawkins "attesting to the parent-child relationship" or whether the presence of Hawkins's name on the birth certificate amounted to his signature for purposes of OCGA § 53-2-3 (2) (A).[5]

---

[5] Ridley has not raised, and we therefore do not address, whether there was "other clear and convincing evidence" before the probate court that Makaleb was "the child of" Hawkins for purposes of OCGA § 53-2-3 (2) (A) (v).

8

1. The paternity acknowledgment signed by Ridley and Hawkins was not a "sworn statement" for purposes of OCGA § 53-2-3 (2) (A).

To swear is both "to administer an oath to a person" and "to take an oath." Black's Law Dictionary, 9th ed. 2009. Thus a sworn statement, such as an affidavit, is "a statement under oath taken before a person having authority to administer such oath." *Sambor v. Kelley*, 271 Ga. 133, 134 (1) (518 SE2d 120) (1999) (punctuation and footnote omitted); see also *Shiver v. Norfolk-Southern Ry. Co.*, 269 Ga. 168 (496 SE2d 903) (1998) (defining "testimony" as "[a] statement made by a witness under oath or affirmation" (citation and punctuation omitted)). Both judges and notaries public have the power to administer oaths. See OCGA § 15-1-3 (5) ("[e]very court" has power "to administer oaths in an action or proceeding pending therein and in all other cases when it may be necessary in the exercise of its powers and duties"; OCGA § 45-17-8 (a) (granting notaries public authority to "[w]itness or attest signature or execution of deeds and other written instruments," to "[a]dminister oaths and affirmations in all matters incidental to their duties as commercial officers and all other oaths and affirmations which are not by law required to be administered by a particular officer," and to "[w]itness affidavits upon oath or affirmation.")).

9

Here, and despite the paternity acknowledgment's statement that it amounted to an "affidavit," there was no evidence before the probate court, including the evidence presented on Ridley's motion for reconsideration, to support the conclusions that DeLaine, the witness to Ridley and Hawkins's execution of the paternity acknowledgment, was a notary public or other official such that she had authority to administer any oath to Hawkins; that DeLaine administered an oath on Hawkins; or that the acknowledgment was actually notarized by her or any other person. It follows that the probate court did not err when it concluded that the paternity acknowledgment was not a "sworn statement" for purposes of OCGA § 53-2-3 (2) (A) (iii). See *Dockery v. State*, 287 Ga. 275, 277, (4) n. 2 (695 SE2d 599) (2010) (documents entitled "affidavits" were not such because "they were not executed with any of the legal formalities required of a valid affidavit"); OCGA § 45-17-6 (a) ("An official notarial act must be documented by the notary's seal"); *Hurt v. Norwest Mtg.*, 260 Ga. App. 651, 654 (1) (a) (580 SE2d 580) (2003) (an affidavit of indigence missing a notarial seal invalidated the attestation in the affidavit).

2. Although documentary and testimonial evidence showed that Georgia birth certificates do not normally bear the signature of either the mother or the father of the named child, it is undisputed that Hawkins never signed Makaleb's birth certificate.

10

"[T]he 'golden rule' of statutory construction . . . requires us to follow the literal language of the statute unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else." *Telecom\*USA v. Collins*, 260 Ga. 362, 363-364 (1) (393 SE2d 235) (1990) (citation and punctuation omitted). We are not authorized to ignore the plain language of OCGA § 53-2-3 (2) (A) (iv) requiring Hawkins to sign Malakeb's birth certificate in order to render Makaleb his heir at law. See *In re Estate of Garrett*, 244 Ga. App. 65 (534 SE2d 843) (2000) (where there was no judicial determination of paternity before a child's death intestate, and where the father did not sign the child's birth certificate or execute a sworn statement of paternity before that event, a probate court's finding of paternity after the child's death did not satisfy the requirements of OCGA § 53-2-4 (b));[6] *State v. M. A. Barnett*, 136 Ga. App. 122, 123 (220 SE2d 730) (1976) (absence of affiant's signature from a search warrant required suppression of the evidence seized under that warrant).

---

[6] OCGA § 53-2-4 (b) authorizes inheritance *from* an intestate child born out of wedlock to that child's father or other paternal relations if (1) a court has "entered an order declaring the child to be legitimate" or (2) "entered an order establishing paternity;" (3) "[t]he father has, during the lifetime of the child, executed a sworn statement signed by the father attesting to the parent-child relationship;" (4) [t]he father has, during the lifetime of the child, signed the birth certificate of the child;" or (5) "[a] presumption of paternity . . . has been established and has not been rebutted by clear and convincing evidence."

11

Because Hawkins neither executed a sworn statement of paternity nor signed Malakeb's birth certificate before his death, the trial court did not err when it concluded that Malakeb was not Hawkins's heir at law. OCGA § 53-2-3 (2) (A) (iii), (iv); see also *Estate of Garrett*, 244 Ga. App. at 65 (putative father's failure to establish paternity before child's death precluded father's inheritance from that child).

*Judgment affirmed. Barnes, P. J., concurs. Boggs, J., concurs fully and specially*.

A14A0468. IN RE ESTATE OF HAWKINS.

BOGGS, Judge, concurring fully and specially.

I concur with the majority and all that is said there. I write to reiterate my concerns about the unintended consequences of the administrative legitimation process. Rife with frailties, the process is unquestionably inequitable and susceptible to fraud, in irreconcilable conflict with the body of Georgia law on legitimation and adoption, and potentially violative of the constitutional protections guaranteed to biological fathers and their children.

Before 2005, legitimation of a child was reposed in the discretion of the superior court under OCGA § 19-7-22 (a), or of the juvenile court under OCGA § 19-7-22 (d). Inherent in this statutory framework is the recognition that "[i]n making this determination, the court must examine the benefits that might flow to the child if he were legitimated and to consider the legal consequences of the grant of the petition" and may only be reversed for an abuse of discretion.[1] (Citation and punctuation

---

[1]The general statement in *Allifi v. Raider*, 323 Ga. App. 510, 512 (746 SE2d 763) (2013) (physical precedent only), that "[a] father's right to legitimate his child is absolute, subject only to the qualification that the natural mother may object," is not binding precedent, Court of Appeals Rule 33 (a), and is based upon a 1974 decision construing former Ga. Code Ann. §74-103.

omitted.) *Caldwell v. Meadows*, 312 Ga. App. 70, 71 (1) (717 SE2d 668) (2011). This judicial oversight includes an inquiry into whether the biological father has abandoned his opportunity interest, his fitness as a parent, and the best interest of the child. Id.; see also *Binns v. Fairnot,* 292 Ga. App. 336, 337 (665 SE2d 36) (2008). On occasion, this inquiry demands a finding that legitimation is *not* in the best interest of the child. The court may find, for example, that the attempted legitimation is for some improper purpose, that the father has a history of intractable substance abuse, mental health, family violence or criminal history issues that pose an unreasonable risk to the child, or that the child's current status quo should not be disrupted.

The most important aspect of this statutory framework is the objective scrutiny afforded by judicial oversight and the mandate that petitions should only be granted when doing so is in the best interest of the child. However, in direct contravention of this process, OCGA § 19-7-21.1 (b), and its predecessor, OCGA § 19-7-22 (g) (2), permit legitimation via a voluntary, administrative process without any oversight whatsoever, judicial or otherwise.

Ga. L. 2005, p. 1491 §1 created for the first time a non-judicial process for the acknowledgment of paternity and legitimation, codified in OCGA § 19-7-22 (g) (2):

2

In any voluntary acknowledgment of paternity which has been made and has not been rescinded pursuant to Code Section 19-7-46.1, when both the mother and father freely agree and consent, the child may be legitimated by the inclusion of a statement indicating a voluntary acknowledgment of legitimation.

The proponents of this amendment contended that legitimation was necessary for the father of a child born out of wedlock to obtain visitation and to provide for inheritance, but this is not accurate.[2] See, e.g., OCGA § 53-2-3 (2) (A), enumerating five methods by which a father may legitimate; OCGA § 19-7-51, providing for visitation privileges upon a determination of paternity, albeit by court order; OCGA § 9-7-22 (c), specifically providing for inheritance. James B. Outman, "Special Topics in Adoption Law & Practice in Georgia," Institute of Continuing Legal Education, November 7, 2008, at 2-3.[3]

---

[2]I acknowledge with thanks the contributions of James B. Outman, Esq. with regard to the legislative history of the administrative legitimation process, as well as some of the problems it has created. James B. Outman, *Adoption Law Update*, Institute of Continuing Judicial Education, July 24, 2013; James B. Outman, *Special Topics in Adoption Law & Practice in Georgia*, Institute of Continuing Legal Education, November 7, 2008.

[3]The Georgia Department of Human Resources and the Office of Child Support Services supported this legislation, but the latter acknowledged in testimony during the 2008 legislative session that while the number of illegitimate children in Georgia had decreased after the 2005 enactment, the amount of child support received on their behalf did not increase. Id. at 3.

In 2008, the General Assembly added to SB-88, the "Care of a Grandchild Act," a provision establishing a new Code section, OCGA § 19-7-21.1, with a more elaborate procedure for the administrative acknowledgment of paternity and legitimation. Ga. L. 2008, p. 667, §4. The Department of Vital Records promulgated a revised form, Form 3940, in response to these changes. But the legislature failed to delete OCGA § 19-7-22 (g) (2) and failed to amend other related Code sections, creating yet more statutory conflict in the areas of guardianship and inheritance. For example, the appeal before us is a direct result of the failure to amend the inheritance statutes to conform with OCGA § 19-7-21.1. See Outman, *Special Topics*, supra, at 8-11.[4] Moreover, the revision provided that "[v]oluntary acknowledgment of legitimation shall not authorize the father to receive custody or visitation until there is a judicial determination of custody or visitation," OCGA § 19-7-21.1 (e), apparently negating the original expressed intention of the proponents to provide for visitation.

---

[4]The majority correctly notes that Ridley has not raised below or on appeal a contention that an acknowledgment of legitimation satisfies or renders unnecessary the requirements set forth in OCGA § 53-2-3. It is also correct that neither OCGA § 19-7-22 (g) (2) nor OCGA § 19-7-46.1 specify that a voluntary acknowledgment of paternity or legitimation obviates those requirements. But the obvious conflicts, as well as all the other problems noted here, exist whether raised by this appellant or by others in the future.

Pursuant to OCGA § 19-7-22 (g) (2), a form styled "Paternity Acknowledgment - State of Georgia" was created by the State Department of Vital Records and executed by Ridley and Hawkins in 2007. The majority correctly concludes that the acknowledgment as it existed at that time did not constitute a "sworn statement" for purposes of OCGA § 53-2-3 (2) (A) (iii).[5] And it also correctly concludes that Hawkins did not in fact "sign" the birth certificate as provided by OCGA § 53-2-3 (2) (A) (iv), although Georgia makes no apparent provision for him to do so.

In *Sauls v. Atchison*, 316 Ga. App. 792 (730 SE2d 459) (2012),[6] we noted that OCGA § 19-7-21.1 (b)

> circumvents the safeguards inherent in our legitimation statute, OCGA
> § 19-7-22, which requires a petition in Superior Court and a finding that

---

[5]This conclusion is supported by the 2008 amendment, which added the provision that the making of a false statement on the voluntary acknowledgment of legitimation "shall be punishable as an act of false statements and writings under Code Section 16-10-20," OCGA § 19-7-21.1 (f), as well as the revised form promulgated by the Department of Vital Records, which provides a notary certificate form for each signature. But it seems altogether unlikely that an oath is administered and the form signed in the presence of a notary in every instance, particularly in the environment of a hospital maternity department. Outman, *Adoption Law Update*, supra, at 4. Nor does it seem likely, in my opinion, that any violation of this requirement would ever be prosecuted.

[6]I take this opportunity to correct a misstatement in *Sauls*. While that case was decided in 2012, the paternity acknowledgment was executed in 2005  and thus fell under OCGA § 19-7-22 (g) (2) rather than OCGA § 19-7-21.1.

5

legitimation is in the best interest of the child. There is no statutory time frame for the filing of these forms and thus no meaningful way for the courts or attorneys to know whether the form has been signed. On occasion this causes the filing of unnecessary petitions for legitimation, and could potentially cause inconsistent findings as well. In short, under OCGA § 19-7-21.1, the mother and any male may agree – whether by mistake or by plan – to have someone other than the biological father sign this form. And a male who simply signs a pre-printed form in the hospital (or within 12 months thereafter) is by that minimal act alone placed on the same legal footing as a father whose paternity has been judicially determined with the benefit of formal notice, evidence and a hearing at which the court must determine whether legitimation is in the best interest of the child.

Id. at 793 n.1. In *Sauls*, none of these issues was presented squarely for resolution by this court, nor in *Allifi v. Raider*, 323 Ga. App. 510, 513 (1), 515-516 (746 SE2d 763) (2013) (Ray, J., concurring specially and in judgment only), where the potential problems were noted again by both the majority and the concurring opinion. But now, we are presented with a case in which these anticipated problems come into clearer focus. See also *Ray v. Hann*, 323 Ga. App. 45, 47 (746 SE2d 600) (2013).

When, as here, the mother of a child born out of wedlock and a man known not to be the father deliberately misrepresent the facts in an administrative acknowledgment of paternity and legitimation, significant harm could result not only

6

to the actual, biological father, but to the child as well. This may and does occur without any judicial inquiry, without any attempt by a factfinder to determine actual paternity by means of a DNA test or otherwise, and without any finding that legitimation is in the child's best interest, all in direct conflict with OCGA § 19-7-22 (a) – (f.1). And while in a particular case it may be laudable and even heroic for a man known not to be the father to accept the responsibilities of parenthood, this should not occur without some judicial oversight.

Opportunities for fraud and collusion abound in this flawed scheme. Not only to establish a false paternity to obtain dependent benefits, as was alleged in this case, but for revenge following a failed relationship, or for monetary gain through obtaining control over a minor child's assets or claim for personal injury. Moreover, a man who signs the form believing himself to be the father, but later determines that he is not, may be bound to pay child support and to reimburse the State for public assistance paid to the mother, while the actual, biological father may be excused from his obligations. In all such cases, the opportunity to establish the true state of affairs and the best interest of the child, as well as due process of law for the child and the biological father, are frustrated by these statutes.

In essence, parties to an acknowledgment can unilaterally create a wholly fictitious father-child relationship, which is tantamount to an adoption without any of the procedural and due process safeguards of the adoption statutes for the actual, biological father – notice and an opportunity to be heard before his parental rights are terminated – or for the child's best interest and natural right to have a relationship with the biological father. This failure to take into account due process concerns, the obligations and rights of the biological father and the rights of the child, could raise significant issues regarding the constitutionality of the administrative process.

Moreover, once a fraudulent administrative legitimation has occurred, there is no procedure under Georgia law for "the de-legitimation of a child" or "the disestablishment of paternity." *Ghrist v. Fricks*, 219 Ga. App. 415, 419 (1) (465 SE2d 501) (1995), overruled on other grounds, *Brine v. Shipp*, 291 Ga. 376, 380 (3) (729 SE2d 393) (2012).[7] While it may be true that the administrative legitimation process

---

[7]A determination of paternity may be set aside by a superior court only in a child support action and under strictly limited circumstances, and only when the father was unaware that he was not the biological father and has not "[s]igned a voluntary acknowledgment of paternity as provided in Code section 19-7-46.1." OCGA § 19-7-54 (b) (5) (F). It appears that a collateral attack based upon fraud, false swearing, mistake, or evidence newly discovered by a third party may be the only available method to declare an administrative acknowledgment of paternity and legitimation void when it is clear that it has been signed by a non-biological father. See generally *In re White*, 254 Ga. 678 (333 SE2d 588) (1985) (mistake); see also *Venable v. Parker*, 307 Ga. App. 880, 884 (706 SE2d 211) (2011) (Dillard, J., concurring fully and specially).

has resulted in fewer illegitimate children in Georgia, it has produced a litany of unintended consequences and conflicts with statutory law, allowed boundless opportunities for fraud, and can arguably deny fathers and children their constitutionally protected rights. Our appellate courts have neither the means nor the authority to address the myriad of problems occasioned by this seemingly well intentioned but flawed process. As we noted in *Sauls*, supra, "this is for the General Assembly, not this court, to address." Id. at 793 n.1.